Fellers v. Howe.

---

JENNIE FELLERS, APPELLEE, v. LOUIS HENRY HOWE, APPELLANT.

FILED JULY 7, 1921.  No. 21649.

1. Trial: INSTRUCTIONS: EXCEPTIONS. Where exceptions are taken to two certain instructions given by the trial court, and it appears that said instructions bear such relation to each other that if one is upheld the other, at most, becomes harmless error, said instructions will be construed together, and upon sustaining the former the exceptions to the latter will likewise be overruled.

2. Pleading: CONSTRUCTION. In the construction of certain allegations in a pleading, to the sufficiency of which, in so far as they purport to state the fact intended by the pleader, no complaint is made by either party, the rule that it will be taken most strongly against the pleader will be applied, and the general rule that the allegation of a pleading shall be liberally construed with a view to substantial justice between the parties does not apply.

3. Evidence: EXPERT EVIDENCE: HARMLESS ERROR. Where, in a breach of promise suit, certain practicing physicians were permitted to testify generally as to what would be the natural effect upon the physical and nervous health of a woman who had experienced the disappointment caused by a broken marriage engagement by her affianced under conditions stated in the hypo-

thetical question set forth in the opinion, *held*, for reasons stated in the opinion, no error.

4. **Marriage Contract: ACTION FOR BREACH: ADMISSIBILITY OF EVIEDNCE.** Where, in an action for breach of promise to marry, evidence is introduced of the defendant's reputation for wealth in the community in which he lives, when, as in this case, it is followed by an instruction to the jury to the effect that such evidence was admitted, not for the purpose of proving the defendant's ability to pay damages, but only as tending to show the condition of life which the plaintiff would have secured by a consummation of the marriage contract, *held* no error. *Stratton v. Dole*, 45 Neb. 472.

5. **Appeal: INSTRUCTIONS: HARMLESS ERROR.** Although certain instructions of the trial court may be technically erroneous, yet the same will not work a reversal of the case, where the verdict is clearly right on the merits and the only one which could have been reached upon the particular issues involved.

6. **Trial: INSTRUCTIONS: RECITAL OF UNSUPPORTED ALLEGATIONS.** Recital to the jury of allegations in a pleading to support which no evidence had been offered, although, as in the present case, not always sufficient to require a reversal of the case, is nevertheless bad practice and should be carefully avoided as far as possible.

7. **Appeal: EXCESSIVE VERDICT.** Where the only reversible error appearing in the record is that the amount of the recovery is excessive, but not as the result of passion or prejudice of the jury, this court will affirm the judgment upon the excess being remitted.

APPEAL from the district court for Richardson county: JOHN B. RAPER, JUDGE. *Affirmed on condition.*

*Kelligar, Ferneau & Gagnon, T. J. Doyle* and *P. R. Halligan,* for appellant.

*Stout, Rose, Wells & Martin* and *Dort & Cain, contra.*

Heard before MORRISSEY, C.J., ALDRICH and FLANSBURG, JJ., DICKSON and TROUP, District Judges.

TROUP, District Judge.

This is an action brought by Jennie Fellers, appellee, against Louis Henry Howe, appellant herein, to recover damages for an alleged breach of contract to marry. The issues, as contained in the pleadings, may be briefly summarized as follows:

The petition states that the acquaintance and friendship between plaintiff and defendant began when plaintiff was about 14 years of age, defendant being 10 years her senior; that the continuance of this friendship ripened into attachment and courtship and culminated in an engagement to marry in December, 1896; that from time to time from that date to September 7, 1918, defendant reiterated promise and agreement of marriage; that there was reliance thereon by plaintiff until September 7, 1918, and readiness upon part of plaintiff to marry at any time; that plaintiff gave her entire time and affections to the defendant as to courting, and no attention to any other man, and defendant did likewise; that in contemplation of the marriage defendant gave plaintiff many gifts; that no exact time for the marriage was fixed because defendant stated that his mother was old and she and plaintiff would be unable to get along together, but that he would arrange it and they would soon be married, all of which statements plaintiff believed and relied upon and kept herself ready for the marriage at any time; that upon September 7, 1918, plaintiff requested the fulfilment of said agreement to marry, and defendant then and there, for the first time, refused to fulfil his promise and breached said agreement; that plaintiff had great affection for defendant, was at the time of filing the petition 41 years old, had lost her expectations of advantageous marriage and settlement in life and of maternity; she was injured in her feelings and affections, humiliated and rendered ill and nervous; that defendant during the courtship and engagement consulted with plaintiff, and she assisted, so far as possible, in helping to accumulate his property; that he is possessed of real estate and other property worth $88,000, and plaintiff prays damages in the sum of $50,000.

After a denial of all allegations in the petition not admitted, the answer of defendant admits that the marriage contract or engagement existed between plaintiff and defendant for several years prior to the commence-

ment of this action, but alleges that by mutual agreement no time was ever fixed for the marriage; that during the time defendant was conducting the farm plaintiff declined to marry defendant because she did not care to live on a farm with his father and mother; that after the death of his father, in 1901, defendant continued to live on the farm and care for his mother, aged 87 years; that plaintiff from time to time declined to marry defendant while he lived with his mother, giving as a reason therefor that she could not get along with his mother, and defendant refused to forego his duty to his mother; that in 1916 plaintiff became afflicted with goitre and other ailments which permanently affected her health and rendered her an invalid, weak and emaciated in body, and of unsound mind, and unfit for the marriage relation; that she changed from a courteous and affectionate to a discourteous, cold and hostile disposition; and, in fact, plaintiff made it so disagreeable that defendant had no desire to visit or be with plaintiff; that in 1911 defendant was anxious to marry plaintiff and attempted to rent a house, but plaintiff again stated that she would not marry him while his mother was living, and reiterated this statement on various occasions up to and including their last conversation on the subject in September, 1918.

The reply of plaintiff, denying all allegations in the answer not admitted, admits plaintiff became affected with goitre, but that same did not appear until the engagement had subsisted for 20 years, and that said ailment did not incapacitate her for marriage; that defendant at no time disavowed his promise to marry plaintiff, but, on the contrary, adhered to and repeated his promise during the entire period of her ailment; that the affliction was temporary and curable, and had been entirely and permanently cured, as defendant knew, prior to his breach of the engagement September 7, 1918.

A trial of the action to a court and jury resulted in a verdict for the plaintiff for $22,000. Judgment was rendered thereon, and defendant appeals.

The chief objection by the defendant, and that most urged, both in the oral argument and printed brief, is to the giving of instruction No. 18 by the trial court, whereby it is claimed the court withdrew from the consideration of the jury the averment of the answer: That during the early part of the year 1911 the defendant was anxious to marry the plaintiff, and entered into negotiations to rent a home. The plaintiff told the defendant not to rent a home, that she would not marry him while his mother lived, and continually thereafter stated she would not marry him while his mother lived, and so stated in the last conversation in September, 1918.

Instruction No. 18 is as follows: "Touching the allegation of defendant's answer that in the year of 1911 defendant was anxious to marry plaintiff, and that plaintiff then stated to defendant that she would not marry him while his mother was living, you are instructed that this averment when read in connection with an allegation contained elsewhere in the answer that, by mutual agreement between the plaintiff and defendant, no time was ever fixed when said marriage should take place, does not tender the issue that the plaintiff by her own conduct or statements terminated the contract or engagement to marry in said year."

We are of the opinion that much more importance is attached to this alleged error than the situation warrants. Instruction No. 18 should be considered in connection with instruction No. 16. Instruction No. 16 is as follows: "You are instructed that it is the law of this state that facts alleged in the petition and admitted in the answer are to be taken as true and need not be supported by evidence. In this connection you are instructed that the plaintiff alleged the existence of a contract between plaintiff and defendant to marry and that defendant's answer 'admits that a marriage contract or engagement to marry existed between the plaintiff and defendant for several years prior to the commencement of this action.' You will therefore accept as true without proof

the fact of a continuing 'marriage contract or engagement
to marry' between the plaintiff and defendant for a period
of several years prior to the commencement of this
action."

That part of defendant's answer to which instruction
No. 16 refers is as follows: "The defendant admits that
a marriage contract or engagement to marry existed be-
tween the plaintiff and defendant for several years prior
to the commencement of this action, but the defendant
alleges, by mutual agreement between the plaintiff and
defendant, no time was ever fixed when said marriage
should take place."

If instruction No. 16 was properly given, then there
was little use or harm in giving instruction No. 18, for
the giving of instruction No. 16 virtually superseded the
necessity for instruction No. 18. After giving instruction
No. 16, then instruction No. 18 was much of the nature
of harmless surplusage, and, if error at all, was error
without prejudice.

Was there error in giving instruction No. 16? We
think not. We believe the well-established rule in con-
struing a pleading, under circumstances similar to those
existing under which the point in the case at bar was
raised, requires that it be taken most strongly against the
pleader. *Gibson v. Parlin & Orindorff*, 13 Neb. 292, and
cases cited; *Duval v. Advance Thresher Co.*, 85 Neb. 181.

The defendant insists that the allegations referred to
should be liberally construed, and cites in support there-
of: *McArthur v. Clarke Drug Co.*, 48 Neb. 899; *Hartzell
v. McClurg*, 54 Neb. 313; *Butts v. Kingman & Co.*, 60 Neb.
224; *Tacoma Mill Co. v. Gilcrest Lumber Co.*, 90 Neb.
104; *Keenan v. Sic*, 91 Neb. 582. It is true these de-
cisions hold as contended for by defendant, but decided,
however, apparently in pursuance of section 121 of the
Code then in existence, requiring the allegations of a
pleading to be liberally construed with a view to substan-
tial justice between the parties. This section, however,
has been omitted from the Revised Statutes of 1913 ap-

parently, and no longer appears therein, so far as we have been able to discover. Whether this omission occurs by inadvertence or otherwise we do not know; perhaps, however, by inadvertence only. What this court would hold to be the rule if the question was presented under circumstances similar to the cases above cited, in the absence of the statute, we do not now say, nor is it necessary at this time to determine, for the point is made now that the rule applied under the circumstances of the cases above cited, whether with or without the aid of the statute, has no application to the situation in the case at bar, and does not abrogate the rule sought to be applied here. In every one of the above cases cited by the defendant we believe the point was raised on demurrer, in one form or another, usually after the case had been tried, to the sufficiency of the petition in not stating a cause of action, and no doubt the court very properly held, under these circumstances, that a pleading should be liberally construed with a view to substantial justice between the parties.

But that is not the situation here. Plaintiff, in the case at bar, is finding no fault with the part of the defendant's answer in question. There is no claim that it is deficient or that it is other than what it purports to be, and, taking it for what is claimed it plainly purports to be, plaintiff insists that the allegation that the defendant "admits that a marriage contract or engagement to marry existed between the plaintiff and defendant for several years prior to the commencement of this action" is an admission by defendant that the marriage contract continued throughout the period mentioned, and therefore was in existence up to and until the alleged breach of the same by defendant, shortly prior to the commencement of this action, and asked the court to so interpret to the jury this part of defendant's answer, which the court did. If the rule contended for by plaintiff properly applies in this instance, and we think it does, then certainly the defendant cannot complain of the construction placed upon said pleading by the court.

Besides, it must be remembered that before this instruction was given the whole of the evidence in the case had been adduced in the presence and hearing of the court and jury, and we feel perfectly justified in saying that it would be impossible for any one to read the record in this case without being convinced, by the overwhelming testimony, that this marriage contract was never renounced nor abrogated by either of the parties, either in 1911 or at any other time prior to September 7, 1918. Except the paragraph heretofore quoted, all of the defendant's answer seems to proceed upon this theory, and all the evidence, defendant's as well as plaintiff's, except for the bare statement of defendant himself, that plaintiff said she would not marry him as long as his mother lived, which is denied by the plaintiff, tends to demonstrate that such was the fact. The defendant continued thereafter to visit the plaintiff almost daily up to the very day before she started for Rochester to have her operation performed, precisely the same as he had done all the years before, bestowing upon her presents, affection and caresses as only one engaged to be married would be expected to do. It is unbelievable, under the evidence, that either party understood that the marriage engagement had been broken at any time and that it did not exist at all times prior to September 7, 1918. Even under the defendant's own theory and statement he considered the consummation of the marriage contract suspended only, for in his cross-examination, after being asked if he did not continue to visit the plaintiff almost daily and bestow presents and affection and caresses upon plaintiff and treat her in all respects, after the incident of 1911, as he had done all the years before, and defendant admitting that he had, he was then asked this question: "Q. And while you were doing that, when you were doing all of that, did you consider the incident closed? A. I did not, I considered it closed as long as mother lived." So that, under the defendant's own theory or interpretation, the moment his mother died the mar-

riage contract would be revived in all its original force and effect. It was only by the defendant's own conduct on and after September 7, 1918, by his abandonment of plaintiff and the marriage contract and his refusal to have anything more to do with her, that the marriage contract was broken.

If this be the true situation, as we think it is, then the trial court made no mistake in its construction of that part of defendant's answer contained in instruction No. 16. If there was no error in giving instruction No. 16, as we think there was not, then instruction No. 18 became of little or no consequence, for, at most, it would leave the allegations of defendant's answer referred to in instruction No. 18 as amounting to no more than a specific denial of the existence of the marriage contract after 1911; an allegation directly inconsistent with his admission, as we have seen, in that part of his answer as construed in instruction No. 16, that there did exist "a continuing marriage contract or engagement to marry between the plaintiff and defendant for a period of several years prior to the commencement of this action." And as such inconsistent allegation, of course, it could not stand. "A pleading should be construed with reference to the general theory upon which it proceeds; and a pleading should not be uncertain as to which of two or more theories is relied on." Phillips, Code Pleading, sec. 354. Also, *Keenan v. Sic*, 91 Neb. 582.

But, again, we think the whole matter involved in instruction No. 18 was effectually disposed of, and any issue that may have been tendered by the allegation of defendant's answer in this respect sufficiently submitted to the jury by the court's first instruction to the jury on the merits of the case and after a statement of the issues. This instruction is designated as No. 12, and is as follows: "It is admitted by the pleadings and the testimony of both parties that there was an engagement or promise of marriage between them. Now, under the pleadings of this case, the burden is upon the plaintiff to prove by

a preponderance or greater weight of evidence that the plaintiff was ready and willing to marry defendant at all times after said engagement and that upon or about the 7th day of September, 1918, the plaintiff offered to marry him as she had promised and requested him to fulfil his promise to marry her."

By this instruction the trial court virtually told the jury that plaintiff could not recover at all unless she had established by a preponderance of the evidence all of the facts embraced in said instruction, including the fact that "plaintiff was ready and willing to marry defendant *at all times after said engagement.*" The jury, by its verdict for plaintiff, must have found that this last-stated fact was true. If it did, then it perforce must have found that there was no broken engagement in 1911, nor at any other time prior to September 7, 1918.

We are of the opinion that the exceptions to instructions No. 16 and No. 18 are not well taken, and the same are therefore overruled.

Certain medical gentlemen, Doctors Mitchell and Hayes, were called to testify in behalf of plaintiff, and to each was put a question, hypothetical in form, in substance, as follows: In a case where there has been more or less persistent courtship of a girl, beginning at the age of about 16, with an engagement to marry at 19, to a man ten years her senior, and this courtship continued from that period until she reaches the age of 40, she remaining a virgin and unmarried, what would be the natural effect of that experience on such virgin woman, as to her physical and nervous health, of the breaking of the engagement to marry by her affianced, and upon being told by him that he would not marry her?

To this question the defendant objected as invading the province of the jury, not a proper matter for expert testimony, and as immaterial and irrelevant. The objection was overruled, and Doctor Mitchell answered as follows: "I am not an authority on love and courtship, but I do know this: That there isn't anything that would

so upset the nervous system as love affairs and a broken engagement, whether in a woman or in a man; I think more in a woman than in a man." Doctor Hayes, to whom was propounded a similar question, answered, over a similar objection, as follows: "The effect might be decidedly exhaustive to her nervous system." The plaintiff then asked the witness: "Now, what would you say would be the natural tendencies of that experience?" To which the witness answered, over a like objection by defendant: "The natural tendency would be that the girl was suffering a depression, nervous depression, and a more or less nervous exhaustion."

The chief objection to these questions, as we view it, is the meagre foundation laid for expert testimony on the subject. We think plaintiff should have been required, first, to show what the actual physical and nervous health of the plaintiff was at the time she received the knowledge of the broken engagement, and then to have asked these witnesses, upon conditions shown, what would be the natural and probable effect on her physical and nervous health of a sudden knowledge of a broken engagement. For it is evident that all persons are not affected alike, under like circumstances. It depends much upon the nature and temperament of the individual as to how such an incident as the one in question would affect such individual. One might be prostrated with grief followed by serious physical and mental illness, more or less enduring, while another might accept it with comparative indifference. Nor does the same cause always produce the same effect upon the same person; it depends many times upon the particular condition of the physical and nervous health of the individual at the time, as also the circumstances under which the incident occurs.

But, with all this admitted, are the answers, as given by the witnesses, prejudicial to the defendant, so prejudicial as to require a reversal of the case? We think not. Conceding, as we may, the meagre basis supplied in this instance for the introduction of expert testimony, never-

theless we think that it cannot be said the situation was one entirely destitute of ground upon which evidence of this character might be admitted. It is but fair to assume that, by and through his observations and experiences in more or less constantly treating persons who have undergone an experience, or like experience, indicated by the facts involved in the hypothetical question, a practicing physician must gain some knowledge of the natural and probable effects such an experience would have upon the physical and mental health of such persons, which the average layman would not possess. This is all that is required, under the authorities, to entitle such evidence to be received. It is in evidence also that both these physicians had a long personal acquaintance with the plaintiff; Doctor Mitchell knowing and treating her occasionally ever since she was two years old, and Doctor Hayes having a personal acquaintance with her for at least 30 years. With this fact in the minds of the witnesses when they testified, as it doubtless was, the danger of any mistake in their answer, as applicable to the instant case, would be reduced to the minimum. We do not believe such error obtained in the introduction of this testimony as requires a reversal of the case, and the exceptions thereto are therefore overruled.

Complaint is also made that the court erred in admitting evidence of defendant's reputed wealth. Evidence was received from at least three witnesses as to defendant's reputation for credit and pecuniary wealth in the community in which he lived in September, 1918. But this was followed by instruction No. 25 to the jury: "That said evidence was not admitted for the purpose of proving defendant's ability to pay damages, but as tending to show the condition in life which the plaintiff would have secured by consummation of the marriage contract." There was no error in receiving this evidence, when limited, as it was, in its effect and purpose, by the above instruction. *Stratton v. Dole*, 45 Neb. 472, and cases therein cited. Besides, this evidence was followed by

Fellers v. Howe.

further evidence of the same witnesses and others as to defendant's actual wealth, and in no instance, we believe, did the amount of his reputed wealth exceed that given as the amount of his actual wealth, and neither is anywhere materially disputed by the defendant. This assignment must also be overruled.

Upon the the assumption that the defendant has properly interposed the alleged existence of plaintiff's physical and mental illness as a defense to this action, he objects to certain instructions given and others refused on that phase of the case. There may be some question as to the theory upon which defendant was entitled to have this phase of his defense considered at all. It is true he recounts at considerable length in his answer the irritability of plaintiff, her physical, nervous and mental illness, unfitting her for the marital relation, and he and others testified to these facts as existing subsequent to and including the year 1916, but he nowhere, at any time, assigned this as a reason for refusing to marrying the plaintiff; but the sole and only reason assigned for his refusal, either in his answer or his evidence, up to and including September 7, 1918, the date of the last conversation between them on the subject, is that plaintiff refused to marry defendant so long as his mother lived. So it would seem that the only theory, if any, upon which defendant is entitled to avail himself of the defense of plaintiff's impaired health is a recognition of the present existence of the marriage contract, but that he ought not to be held liable for its breach because of plaintiff's unfit physical condition, and it is upon this theory only we feel warranted in considering this phase of the case.

The chief objections interposed by defendant on this branch of his case are to instructions No. 13 and No. 22, given by the court on its own motion, which may be considered together. Instruction No. 13 is as follows: "The defendant alleges that the plaintiff, in September, 1918, was afflicted by a disease that rendered her unfit for the marital relation. The burden of proof is upon the de-

fendant to prove by a preponderance of the evidence that the plaintiff was at that time afflicted by some disease that unfitted her permanently for the marital relation, and unless the defendant has so satisfied you by a preponderance of the evidence you should find against the defendant on such issue."

Instruction No. 22 is as follows: "In order that an illness of one of the parties to a contract to marry constitute a justification or excuse for the renunciation of the contract or refusal of the other party to consummate the marriage, it is necessary that such illness be permanent and incurable."

At first, we were strongly impressed with the belief that the giving of these instructions, particularly instruction No. 22, was error for which the case must be reversed. Upon mature consideration of the whole case, as reflected by the evidence, however, we conclude that the objections should be overruled. It is contended by the defendant that when the court instructed the jury, in instruction No. 13, that, before the defendant could avail himself of the defense pleaded, it was incumbent upon him to prove that at the time in question the plaintiff was afflicted with some disease which unfitted her *permanently* for the marital relation, and when, in instruction No. 22, the court told the jury that, in order that an illness of one of the parties constitute a justification for the refusal of the other party to consummate the marriage, it is necessary that such illness be *permanent* and *incurable,* is going too far beyond the rule established by the great weight of authority on this question. We think we will agree with the defendant that the court probably erred in requiring it to be shown that the alleged illness of plaintiff was *permanent* and *incurable.* We think the better rule in such case is something like this: Where disease or physical disability rendering it unsafe or improper to marry has developed in either party to the contract, without intervening fault on the part of the other, subsequent to the making of the con-

tract and before its consummation by marriage, such other party will be required to wait a reasonable time for a cure to be effected, and if such disease or disability proves to be of a permanent character, may refuse to carry out the contract. See 9 C. J. 339, sec. 31, and cases cited. But, as before stated, we think this case should not be reversed because of the error complained of. If with or without these instructions a verdict for plaintiff is the only verdict that could be rendered by the jury under the evidence, the case will not be reversed because of an erroneous instruction. *Stratton v. Dole*, 45 Neb. 472. The evidence imperatively demands a verdict for plaintiff in some amount, and the instructions referred to could not affect the amount.

In this connection it is perhaps proper to give a brief statement of what the evidence shows in regard to plaintiff's illness and the facts and circumstances surrounding the same. The undisputed evidence shows that in the spring of 1916, and after the contract of marriage between plaintiff and defendant had existed for nearly 20 years, during which time the plaintiff enjoyed almost perfect health, she became seized with pains in her neck, which gradually grew more severe and which caused her, at times, to be exceedingly irritable and nervous, with more or less loss of appetite, and so continued up to about July, 1918, although at no time, however, was she not able to be "up and about." In attempts to discover the nature of her illness she visited and consulted physicians in Lincoln, Chicago, and the Mayo Brothers at Rochester, Minnesota, but without, at that time, gaining further knowledge of the true cause of her ailment. She then visited California, where she spent some time with the hope that a change of climate would benefit her health, returning, however, but little improved. Some time thereafter it was discovered she was afflicted with goitre, and after advising with defendant what to do, stating that she would do whatever he said, in the month of June, 1918, she returned to the Mayo Brothers at

Rochester, where an operation for the removal of the goitre was performed, and where she remained under the doctor's treatment for a period of ten weeks, returning to her home at the end of that time, so runs the evidence, feeling "good and very happy." Doctor Mitchell, having examined the plaintiff after her return, testified that the goitre had been removed so that there was no longer any enlargement of the neck, and that the illness had in no way incapacitated her for the consummation of marriage or the performance of the marriage functions, including maternity.

It is undisputed that during the whole period of her illness, except for the short time plaintiff was absent from home for the purposes above stated, the defendant visited plaintiff almost daily, accompanied her and her sister on their trip to California, corresponding with her in her absence, and treated her with love and endearment in all respects as he had done throughout this especially long engagement, even up to the very evening before her departure for Rochester for the operation, when, as always, he bestowed upon her the embraces and caresses of a lover; yet never once, then or at any other time, intimated that he desired any modification of the marriage contract; but, on the contrary, upon an occasion shortly before her departure for Rochester, the plaintiff, in speaking to defendant of her illness, and stating to him that, if he ever got tired of her or came not to care for her, she hoped he would tell her so and they would fix matters up in some way, the defendant made answer, as testified to by plaintiff, "He said he never would give me up as long as there was a breath in my body." It was not until plaintiff returned from Rochester "good and very happy," as plaintiff and others testified, that defendant manifested a disposition to have no further relations with her and to abandon the engagement. Under these undisputed facts and circumstances, we submit that the only verdict that could be rendered is one for plaintiff, and, that being

true, the objections to the instructions last referred to will be overruled.

Objections are made to a number of other instructions directed to the merits of the case, but to comment on each separately would extend this opinion to an unnecessary length.   Suffice it to say they have all been examined and considered, and we find no error in any or all of them to justify criticism.

Again, objections are made to numerous so-called "instructions," but which, although paragraphed and numbered, consist simply of a recital of facts alleged in the pleadings.  Some of these, however, contain averments of the pleadings to support which no evidence was offered. This is not good practice and ought to be avoided, as far as possible, and the court should submit to the jury only such issues in support of which at least some evidence has been admitted.

The final objection of defendant is that the verdict is excessive, and to such an extent as unmistakably shows passion and prejudice on the part of the jury that rendered it.   While the amount awarded may be somewhat more than should be permitted to stand, we are not of the opinion that it is excessive to such an extent as indicates passion or prejudice on the part of the jury, demanding a retrial of the case, or that, under the rule, forbids this court from properly adjusting the amount to be awarded.

There is no doubt but the plaintiff is entitled to a substantial sum for the breach of this contract.   She gave up more than 20 years of her young life to the defendant's courtship of her, materially aiding him in his business and social life throughout this long period, excluding herself in the meantime from the attentions of all others and the opportunities which might have been hers to contract marriage with another, until now she has reached an age quite beyond the ordinary marriageable age of a maiden.   On the other hand, it must be said to the credit of the defendant that throughout all the years of his engagement to plaintiff his relations with her have never been

other than honorable, kind and indulgent in every respect until the final breach occurred.

The evidence shows both the reputed and actual wealth of the defendant, at the time of the breach, to be all the way from $50,000 to $75,000. The actual wealth of defendant is by no means the sole basis on which damages in a case of this nature are to be measured, but it is a circumstance which will be considered in fixing a proper amount. We are of the opinion that justice will be fully subserved by a reduction of $5,000 from the judgment as awarded, leaving a judgment of $17,000 as the amount to be recovered.

The order will therefore be that, if within 20 days from the filing of this opinion the plaintiff file in this court a remittitur of $5,000, the judgment so reduced will be affirmed; otherwise, the case will stand reversed and a new trial ordered.

                            AFFIRMED ON CONDITION.

ALDRICH, J., dissents.