PETER KAISER, as *Administrator*, etc., V. THE STATE
OF KANSAS.

No. 16,066.

SYLLABUS BY THE COURT.

1. INSANE PERSONS — *Liability of Estates for Cost of Mainte-
nance at State Hospital—Constitutional Provision.* The pro-
vision of the constitution (art. 7, § 1) that "institutions for
the benefit of the insane, blind, and deaf and dumb, and such
other benevolent institutions as the public good may require,
shall be fostered and supported by.the state, subject to such
regulations as may be prescribed by law," does not prevent
legislation making the estates of persons committed to the
state hospital for the insane liable for the cost of their main-
tenance there.

2. CONSTITUTIONAL LAW—*Uniform and Equal Taxation.* Nor is
such legislation in conflict with the constitutional provision
requiring uniformity and equality in the rate of taxation.

3. INSANE PERSONS — *Liability of Estates for Maintenance at
State Hospital.* Under the provision of the statute in relation
to the state hospital for the insane (Gen. Stat. 1889, § 3726;
Gen. Stat. 1901, § 3988) that if the probate court shall find
that a person adjudged to be insane has sufficient means for
his maintenance and that of his family, without impoverish-
ment, it shall order his guardian to pay for his maintenance
out of his estate, the state may upon the death of a patient in
such hospital recover from his administrator the cost of his
maintenance for any period during which he was possessed of
means not needed for the support of any one dependent upon
him.

4. ———— *Same.* The rule stated in the foregoing paragraph is
not altered by the fact that the form of commitment pre-
scribed in that statute, directing the patient to be received
and maintained at the expense of the county or the guardian,
was changed in a revision (Laws 1901, ch. 353, § 60) to read
"at the expense of the state."

5. JUDGMENTS—*Res Judicata.* The fact that the probate court
found that a person adjudged insane was without sufficient
means for his support, and ordered that his maintenance
should be at the cost of the state, does not constitute an ad-
judication against the contention of the plaintiff in an action
brought by the state to charge the estate of such person after
his decease with the cost of his maintenance at the hospital
for the insane.

Error from Franklin district court; CHARLES A. SMART, judge. Opinion filed June 5, 1909. Affirmed.

*William H. Clark,* for the plaintiff in error.

*Fred S. Jackson,* attorney-general, and *John Marshall,* assistant attorney-general, for The State; *John S. Dason,* and *Harry C. Bowman,* of counsel.

The opinion of the court was delivered by

MASON, J.: In 1883 August Freitag was adjudged insane and committed to the state insane asylum, where he remained until 1905, when he died owning considerable property, leaving no one dependent upon him, and having no known heirs. An administrator was appointed, and in 1907 the state brought action against him to recover the expense of Freitag's maintenance during all the time he was at the asylum and recovered a judgment for the full amount, from which the defendant prosecutes error.

The grounds on which a reversal is sought are: (1) That the legislature has no power under the constitution to impose upon the estate of an insane person a liability for his support at a state institution; (2) that if such power exists it was never exercised prior to 1907, and in the absence of a statute there can be no such liability; and (3) that if such liability ever existed it can not be enforced by the method pursued here, especially in view of the proceedings under which the commitment was made.

The state constitution provides that "institutions for the benefit of the insane, blind, and deaf and dumb, and such other benevolent institutions as the public good may require, shall be fostered and supported by the state, subject to such regulations as may be prescribed by law." (Art. 7, § 1.) The defendant insists that this provision affixes to a state hospital for the insane the character of a benevolent institution, and that the exaction of payment from the persons there cared for is

inconsistent with the idea of benevolence; and, also, that
the obligation placed upon the state to foster and sup-
port such an institution implies that it is to be main-
tained wholly at the expense of the public.  We do not
think, however, that the use of the term "benevolent"
in describing the class to which the enumerated institu-
tions belong was intended to confine them to the rendi-
tion of purely gratuitous services.  And even if an un-
qualified requirement that the state should foster and
support such institutions could be regarded as forbid-
ding any charge being made to the direct beneficiaries,
the addition of the words "subject to such regulations.
as may be prescribed by law" precludes such an inter-
pretation here, and plainly indicates that the selection
of ways and means was committed to the legislature
without restriction.  The provision of the constitution
quoted was taken from that of Ohio, with only verbal .
changes.  In *The State v. Kiesewetter*, 37 Ohio St. 546,
a statute was construed to authorize the expense of
clothing the inmate of a state insane asylum to be col-
lected from his estate.  An attack upon its validity
was disposed of in these words:

"It is also claimed that this construction of the stat-
ute brings it in conflict with section 1, article 7, of the
constitution, which declares that 'institutions for the
benefit of the insane, blind, deaf and dumb, shall al-
ways be fostered and supported by the state; and be
subject to such regulations as may be prescribed by the
general assembly.'

"The answer to this objection is that the provision
of the constitution is not self-executing, and that the
mode in which such institutions are to be fostered and
supported is left to the discretion of the general assem-
bly.  That discretion has been exercised in the passage
of the statute now under consideration."  (Page 549.)·

In *Baldwin v. Douglas County*, 37 Neb. 283, the court
held, practically overruling *State v. Douglas County*, 18:
Neb. 601, that a statute requiring those liable for the
support of an insane person to pay the expense of his.
maintenance at a state insane asylum could not be en-

forced against one who as a taxpayer had contributed to the support of the institution, on the ground of a conflict with a constitutional provision requiring the state's revenue to be provided by a tax by valuation, so that every person should pay a tax in proportion to the value of his property. The grounds of the decision were thus indicated in the opinion:

"The annual cost of maintaining the insane hospital is provided for by a general tax, levied with reference to the assessed valuations of the respective counties; again, . . . the amount due the hospital for the care, board and treatment of the insane must be paid by the several counties, reference being had to the amount expended in that behalf for the insane properly chargeable to each county. Thus it would seem that the taxpayer has twice paid taxes for this one purpose. . . . As is said in the *County of Delaware v. McDonald,* 46 Iowa, 171, 'the state reaches out its strong arm and makes the insane its wards, regardless of the care which they may receive at home or the wishes of those upon whom they are dependent for their support. . . . The state asserts its right for the reason an insane person may often need more than a mere maintenance. He often needs restraint, confinement, medical attendance, and peculiar care and treatment. Society is entitled to be protected and relieved against him, and when this is so the state very properly takes charge of him and makes him its ward.'

"We know of no principle of equity or justice that under these circumstances would imply a contract by the husband to answer for the treatment of his wife, furnished by the state in the interest of the general public. It would seem that the public thus benefited should defray all expenses incurred for its protection. . . . The husband has already twice paid for the maintenance of the insane hospital. This was upon his property. If he is required to pay for the treatment of his wife, this payment is just as much a compulsory contribution to the maintenance of the insane hospital as was either of the others. It is in fact another form of taxation for the same purpose. The right to levy taxes can only be justified as being necessary for the performance of its functions by the state. No tax can be legally levied for any purposes foreign to those func-

tions, and, even that far, taxation is tolerated only from the necessities of the case. The collection of unnecessary revenue by the state is not taxation. It is robbery. The plaintiff in error has already paid his full proportion toward the maintenance of the insane hospital. More than that the authorities can not constitutionally exact." (Pages 288, 289.)

Of this case it is said in a note in 20 L. R. A. 850:

"The above case seems to be substantially a pioneer on the question involved. The reasoning on the subject of repeated taxation of the same person seems to leave a question whether or not this repetition of burdens is not more apparent than real. If the county reimburses the state for certain patients the expense for them first paid by the state would appear to be in reality only a loan or advancement which did not constitute a real burden on the taxpayers under state taxation. The same would be true as to the reimbursement of the county by payments from relatives. In other words, what a taxpayer paid in one form would seem to relieve him from a corresponding burden in another form, so that in reality he would in the final event have to bear no larger burden than if he paid it in but one form and at one time.

"As to the power of the state to compel a surrender of insane persons to its keeping and then compel relatives to pay for services thus thrust upon them there is an entirely different question, which, like the preceding one, seems to be quite new in the courts. A parallel case would be a school law which not only made the attendance of children compulsory, and compelled their parents and others to pay taxes for the expense of the schools as in some states at present, but also in addition compelled each parent by special charge to reimburse the state for the share of school expenses apportionable to his own children."

While the case has not been expressly overruled, its credit has been very seriously impaired by a recent utterance of the same court to the effect that the point discussed was not involved, and that the reasoning employed does not appeal to the court as now constituted as sound. (*Kearney County v. Elsam,* 81 Neb. 490.)

Its doctrine was disapproved in *Bon Homme County v. Berndt et al.*, 15 S. Dak. 494, where it was said:

"It seems just and proper that a single man, having no heirs within the United States depending upon him or his estate for support, should be required to reimburse the county for the expenses incurred for his support as an insane patient. The state is under no legal obligation to support insane patients; hence in making provisions for such support the legislature may adopt any system that it may deem wise and proper. The fact that the property of such insane person has contributed its quota to the expense of sustaining such an institution, both on the part of the state and the county, is no more than all other parties having property are required to contribute, though they in fact receive no benefit from the institution. How, then, can it properly be claimed that one who is an inmate of that institution, and has received the benefit of its care and medical treatment, should not be required to reimburse the county for the money expended for such care? The law is uniform, and applies to all parties who are alike situated, and, in our opinion, is unobjectionable in any constitutional view." (Page 498.)

This side of the question was thus presented in *Estate of Yturburru,* 134 Cal. 567:

"The only point urged by the guardian for a reversal of the order is to the effect that the law making the guardian of the estate of an insane person, where the latter's estate is sufficient, responsible for his maintenance at a state hospital for the insane is unconstitutional. But this contention can not be upheld.

"An insane person is liable for the reasonable value of things furnished to him, necessary for his support. (Civ. Code, § 38.) This was so at common law, where the necessaries were furnished by an individual, and we have never seen a case, and do not think any can be found, holding that this rule comes in conflict with any provision of the constitution of this state or any other state of the Union. We see no reason why the same rule should not apply to a state hospital for the insane, which does and furnishes for the insane person only those things required by the law of the state. Certainly, those things which are required by law to be

24—80 KAN.

done and furnished for an insane person may safely be classed as necessaries.

"The contention of appellant based on the theory that these hospitals are charitable and eleemosynary institutions, and should not be converted into boarding-houses, finds a ready answer. It is as necessary to have institutions for the restraint of the insane, whether they be rich or poor, as it is to have prisons and almshouses; and these institutions for the insane are charitable only so far as the legislature makes them so. There is nothing in the constitution inhibiting laws, extending charity to people in need of it; but it is not necessary to extend charity to those who are able to support themselves; indeed, it would be unreasonable to do so.

"A law in effect requiring that patients at the hospitals for the insane shall be there supported out of their own estates is wise and reasonable, and does not come within any inhibition of the constitution against class legislation. . . . It is not double taxation, nor taxation at all, to require a man to be supported out of his own estate. The money ordered paid herein is for the maintenance of the patient. It goes to the support of the hospital only because of the presence of the patient therein." (Pages 558, 559.)

The same view was further emphasized in *State Com. in Lunacy v. Eldridge,* 7 Cal. App. 298. And in *Guthrie County v. Conrad,* 133 Iowa, 171, the conclusion reached was thus stated:

"The law requires the parent to support his minor child, and, whenever public policy or the welfare of the child demands that it be cared for in a hospital for the unfortunate, compensation therefor may undoubtedly be required, not as a proportionate share in the burdens of government, but because of the special relationship. It is a matter of general knowledge that state hospitals care for and treat a great many patients who have no property, and for whose support no one else is liable. This necessitates a general tax for the support of such institutions, and the mere fact that the defendant has contributed his proportionate share of the amount required to meet such expense does not necessarily render section 2297 open to a charge that it imposes a tax." (Page 175.)

The conclusion reached in the Nebraska case re-
ferred to is obviously not due to any peculiarity of the
constitution of that state, but to the conception of the
court of the reasonableness of the statute involved.
The provision there invoked in regard to taxation is
not strikingly different from those found elsewhere,
and corresponds in a general way with the requirement
of the Kansas constitution that the rate of taxation
shall be uniform and equal. (Art. 11, § 1.) We see no
inequality, in any such sense as to involve a violation
of this requirement, in compelling a citizen to con-
tribute his proportionate share as a taxpayer for the
support of an institution for the care of the insane,
and also to pay for his own maintenance there. What
is paid as taxes is for the benefit of the public. What
is paid for the support of an individual is for his own
benefit. Whether all patients at the state hospital for
the insane shall be maintained at the public charge, or
whether those possessed of sufficient property shall be
required to pay their way, is purely a matter of policy,
to be determined by the legislature.

Whether in the absence of a statute the estate of an
insane person is chargeable with the expense of his
maintenance at a public institution is a question upon
which there is some conflict in the authorities. In
*Board of Commissioners of Montgomery County v. Ris-
tine, Adm'r.,* 124 Ind. 242, the court decided it in the
negative, saying:

"It is a thoroughly settled proposition that where
one is received into a charitable institution for support
or treatment the law raises no implied obligation to
pay in the absence of a contract. When an individual
is received into an institution established solely for
benevolent purposes the law refers his reception, and
the relief administered to him, to motives of charity,
unless the charter or by-laws of the society or in-
stitution provide that compensation may and shall be
charged. An institution or society, no more than an
individual, can assume to be dispensing charity and at

the same time create a pecuniary obligation against one to whose necessities it ministers." (Page 246.)

Two of the five judges dissented, upon grounds thus stated:

"The decedent was an insane person, and his condition was such that the public good, as well as his own benefit, required that he be confined. He had an ample estate to compensate those who might care for him, but no private person could be found prepared and willing to assume the burden and responsibility.

"The appellant was so situated that it could take the decedent to its poor asylum and give him proper care and attention without in any way abridging the rights or privileges of others supported at said institution. Under such circumstances we can imagine no satisfactory reason why the appellant should not be reimbursed." (Page 248.)

Such liability is denied in these cases: *Montgomery Co. v. Gupton,* 139 Mo. 303; *County of Oneida v. Bartholomew,* 89 N. Y. Supr. Ct., 80, affirmed 151 N. Y. 655; *State v. Colligan,* 128 Iowa, 536.

These cases have a contrary tendency: *McNairy County v. McCoin,* 101 Tenn. 74; *Dandurand v. County of Kankakee,* 96 Ill. App. 464; *Palmer v. Hospital,* 10 Kan. App. 98.

Most of the cases cited in notes 10, 11 and 12 to paragraph 2, in volume 22 of the Cyclopedia of Law and Procedure, at page 1176, are controlled by statute. Where the expense is sought to be charged, not upon the estate of the insane person, but upon those ordinarily under an obligation to support him, the question may be affected by other considerations, as is indicated in *Richardson v. Stuesser,* 125 Wis. 66.

But we are not required to decide what the rule might otherwise be, for we conclude that the liability in the present instance is determined by the statute. The earliest enactment bearing upon the matter was chapter 92 of the Laws of 1859 (Gen. Stat. 1901, §§ 3941-3986), which remained in force until repealed

by section 1 of chapter 299 of the Laws of 1905. This act provided (Gen. Stat. 1901, §§ 3983-3986) that the probate court should make an order for the "restraint, support and safe-keeping" of any person who should be "so far disordered in his mind as to endanger his own person or the person or property of others," the expense to be paid by the guardian out of his estate, or by the person under obligation to support him, or in default of this by the county, in which case a right of reimbursement should accrue against any one bound for his maintenance. These provisions, although not directly determinative of the question here involved, are important as showing the policy of the state from the time of its organization to have been to hold individuals liable for the cost of caring for insane persons who are restrained primarily for the common good and the expense of whose maintenance has been borne in the first instance by the public. After a state asylum for the insane had been established for some years a law was passed in relation to it which was in force when the inquiry into Freitag's mental condition was instituted. (Laws 1870, ch. 20; Gen. Stat. 1889, §§ 3723-3733.) In section 3 of this act (Gen. Stat. 1889, § 3725) a form was prescribed for a warrant directing the steward to receive a patient and maintain him either at the expense of the county, or of his "guardian or person to bear the expense," as the facts might require. Section 4 read:

"If, in determining the matter of maintenance, the court shall find that a person adjudged to be insane has sufficient means for his maintenance and that of his family, if he have one, without impoverishment, he shall order his guardian or other legal representative to pay for his maintenance out of the proceeds of the estate of such insane person. But if the court shall find that he has no estate, or not sufficient for his maintenance and that of his family without impoverishment, or if he be a minor, and his parents are not able to maintain him away from home, the court shall deliver to the clerk

of the board of county commissioners of the proper county a certificate in form as follows: CERTIFICATE. In the matter of the insanity of A. B., of ——— county. To the board of county commissioners of ——— county: A. B., a citizen of this county, was, after due examination had in this court on the ——— day of ———, 187—; adjudged to be insane, and not having sufficient means known to this court for his maintenance, was, by an order of this court, placed in custody of ——— (name of person or officer), for maintenance at the expense of the county. C. D., Probate judge. (SEAL.)

"When an itemized and verified account shall be presented to the board of county commissioners an order shall be issued for its payment out of the county treasury if the amount is found reasonable."

Provision was made in the two succeeding sections for the admission of patients at private expense upon a physician's certificate.

In 1875 it was enacted "that the expense of keeping and maintaining the insane of the state in the insane asylum shall be paid out of the state treasury; provided, this act shall not affect any existing law which requires any person or persons to pay for the maintenance of such insane person." (Laws 1875, ch. 110, § 1.)

A new act for the government of the state insane asylum was passed in 1879, one section of which reads:

"Whenever necessary, the superintendent shall cause clothing to be issued to patients in the asylum. All issues to indigent persons shall be charged to the state; all other issues shall be charged to the parent or guardian of the person to whom the issue shall be made, and the account therefor shall be forwarded with the account for board." (Laws 1879, ch. 113, § 5.)

These provisions manifested a purpose on the part of the legislature to continue in the case of patients cared for in the state asylum the same policy with regard to the expense of their maintenance that had been in force for years in the case of insane persons cared for, not necessarily at a public institution, but under the control of public officers—that is, the policy of requiring the property of an insane person, so far as not needed

for the support of those dependent upon him, to be applied to the reimbursement of the public for its expenditure made on his account. The evident purpose of the statute of 1875 was to transfer from the county to the state the expense of caring for indigent patients, without affecting the liability of those having sufficient means for their own support.

In the codification of the laws in relation to the state charitable institutions in 1901 a new form of warrant for the commitment of a person to the state hospital for the insane was prescribed, in which the superintendent is directed to receive and maintain such person "at the expense of the state of Kansas." (Laws 1901, ch. 353, § 60.) It can not be supposed, however, that if the legislature had intended to change the law regarding individual liability for the expense of caring for persons committed to the state hospital for the insane it would have indicated so radical a departure from its previous policy by merely changing the phraseology of a blank form of commitment. The words quoted must be interpreted as meaning that the subject of the commitment is to be maintained at the expense of the state (as distinguished from the county), subject to its right of reimbursement where any property is available for the purpose.

The record of the hearing which resulted in Freitag's being adjudged insane recites a finding by the probate court that he was without sufficient means for his support and an order that his maintenance should be at the expense of the state, and the warrant issued in the case directed the steward of the asylum so to maintain him. The administrator contends that this shows an adjudication against the right of the state asserted in this proceeding. We think, however, that the purpose of the judicial inquiry into the financial condition of the insane person is rather to advise the public officers of his situation in that regard than to determine the right of the state to reimbursement for the expense incurred

in his behalf. At all events nothing is decided by it except his circumstances for the time being. Although he may be destitute when committed, any after-acquired property can be applied to his support; and although he may then have abundant means, their subsequent loss will cast the cost of his maintenance upon the state. Whether a claim exists against his estate for his care at the hospital at any given time depends upon whether at that time he had sufficient property for the purpose. This is a question of fact upon which the state is not concluded by the finding made at the time of his commitment.

In a revision of the act concerning insane persons it has been provided that "in all cases of insane persons admitted to the state hospitals, either with or without bond, the state may recover the per capita cost of the maintenance, care and treatment of the inmates of such state hospital and clothing and funeral expenses from the estate of such person." (Laws 1907, ch. 247, § 32.) In view of the conclusions already stated it is not necessary to decide whether this provision would operate retrospectively so as to confer upon the state any right of action that did not already exist against Freitag's administrator.

The judgment is affirmed.