THE STATE OF KANSAS, *Appellee*, v. R. R. MOORE, as Administrator, etc., *Appellant*.

No. 18,354.

SYLLABUS BY THE COURT.

1. "ASYLUM FOR FEEBLE-MINDED"—*Maintenance of Inmates—To Whom Chargeable.* The act creating an asylum for the feeble-minded is held not to contemplate a charge for maintenance against the estates of inmates upon the grounds (1) that it contains no provisions authorizing such charges, similar to those of the statutes regarding the care of the insane; (2) that it provides in terms for such charges in the case of nonresidents, the inference being that if a charge to residents had been intended an express provision therefor would have been made; and (3) that it treats the institution as a school, and a purpose to exact such a charge at an educational institution is not readily to be implied.

2. ——— *Same.* The purpose of the legislature with respect to making a charge for maintenance is to be determined by the educational character of the institution as defined by the statute, notwithstanding that only a small number of its inmates are in fact capable of receiving instruction.

3. FEEBLE-MINDED PERSON—*Estate Liable for Her Maintenance After Transfer to Insane Asylum.* Where a person of unsound mind, who has been an inmate of a public institution for the care of imbeciles, is transferred to a state asylum for the insane, a liability for maintenance at the latter place may attach, notwithstanding the requirements of the law may not have been complied with in the commitment thereto.

4. ——— *Same.* In such a case, after a retransfer to an institution the inmates of which are by law exempt from charges for maintenance, no liability will be incurred, notwithstanding any irregularity in the means by which such change was effected.

5. STATUTE OF LIMITATIONS—*Does Not Run Against the State.* The statute of limitations does not run against the state with respect to a charge for the maintenance of an inmate of a public asylum for the insane.

Appeal from Johnson district court; JABEZ O. RANKIN, judge. Opinion filed November 8, 1913. Modified.

*J. W. Parker,* of Olathe, for the appellant.

*John S. Dawson,* attorney-general, *R. Cecil Fay,* county attorney, *C. B. Little,* of Olathe, and *H. C. Bowman,* of Newton, for the appellee.

The opinion of the court was delivered by

MASON, J.: In 1881 Belle Abbott, then about eleven years of age, was admitted to the Kansas State Asylum for Idiotic and Imbecile Youth, which was then situated at Lawrence, but which was shortly thereafter removed to its permanent location at Winfield. She remained in this institution until October, 1897, when she was ajudged insane by the probate court of Cowley county and committed to the State Insane Asylum at Topeka. After being there two years she was by order of the State Board of Charities returned to the asylum at Winfield, where she remained until she died, on October 17, 1909. The records of the insane asylum contain a recital that she was "discharged not insane." At the time of her death she was the owner of some property. An administrator was appointed. On December 24, 1910, a claim against her estate was filed in behalf of the state, for the expense of her maintenance while at the Winfield and Topeka institutions. The claim was allowed in part by the probate court, and upon appeal to the district court was allowed in full. The administrator appeals.

There is a conflict of judicial opinion as to whether the estate of an insane person, in the absence of a statute, is chargeable with the expense of his maintenance at a public institution. (*Kaiser v. The State,* 80 Kan. 364, 371, 102 Pac. 454, 24 L. R. A., n. s., 295; Note, Ann. Cas. 1913 A, 577.) In the Kansas case cited it was held in substance that whether a charge was to be exacted for the maintenance of an inmate of a public institution is a matter of policy, resting in the discretion of the legislature. A payment was there

required, upon the ground that the statutes on the subject, while not entirely explicit, showed a general purpose to exact reimbursement for the care of patients in the state insane asylums, who had sufficient property to warrant it.  The legislation there construed has no express application to the present case.  The fact that such statutes were enacted with respect to the asylums for the insane and not extended to the institution here involved justifies an inference that a difference of policy was intended.  The original act provided that nonresidents of the state might be received at the Winfield asylum, but only upon payment of compensation to be fixed by the trustees.  (Gen. Stat. 1909, § 8450.) Until 1909 this was the only provision of the statute regarding charges for maintenance there.  The legislature having its attention directed to the general subject would presumably have stated under what circumstances charges should be exacted from residents of the state, if any such exaction had been intended.

The reasonable conclusion seems to be that with respect to the establishment under consideration, as in the case of other educational institutions, the legislative purpose was that the benefits bestowed upon individuals should be paid for by the public.  The force of this view is conceded if the institution in question is to be regarded as essentially of an educational character. But counsel for the plaintiff argue that it is more closely analagous to an asylum for the insane than to a public school, especially in the light of the actual conditions presented.  It appears that although the institution was ·founded in the belief that the unfortunates committed to its care would generally be capable of receiving instruction, experience has proved the contrary. The trial court found that out of about one hundred employees now engaged only two are teachers, who give instruction to a limited number in some of the primary branches; that instruction is also given in

basket weaving and similar manual arts; and that Belle Abbott was never capable of receiving instruction in any school work. We think, however, that the character of the institution must be determined by the statute. The question before us is not whether the inmates of this institution ought to be required to pay for their maintenance, but whether the legislature intended that they should. There is no legislative sanction for maintaining at public expense those capable of profiting by instruction, and requiring payment from all others, or for making the liability turn upon the proportion of inmates at a given time who have capacity to learn. The language used throughout the act creating the institution characterizes it as distinctly educational. Its title reads: "An Act to Establish an Asylum for the Education of the Feeble-Minded and Imbecile Youth." Its first section provides for the establishment of "an institution for the education of idiotic and imbecile children, to be denominated the Kansas State Asylum for Idiotic and Imbecile Youth." (Gen. Stat. 1909, § 8444.) It speaks of the inmates as "pupils." (Gen. Stat. 1909, §§ 8449, 8450.) It thus defines the purpose of the asylum: ".The object of this institution is to train and educate those received so as to render them more comfortable, happy, and better fitted to care for and support themselves." (Gen. Stat. 1909, § 8451.) We think that so long as these statutes stood without express or implied amendment they amounted to a declaration of legislative policy to exempt such inmates of the Winfield institution as were residents of the state from any charge for maintenance, and that this declaration is binding on the court, notwithstanding any change of methods in the actual administration of its affairs.

In 1909 an act was passed, effective March 30, containing these provisions:

"The name of the Kansas State Asylum for Idiotic and Imbecile Youth, sometimes designated as the Kan-

sas School for Feeble-Minded Youth, is hereby changed to the State Home for Feeble-Minded.

"The expense of the maintenance, care and treatment of any inmate shall be paid by the guardian out of his estate, or by any person who by law is bound to provide for and support such person, or the same shall be paid out of the state treasury. The state may at any time recover the per capita cost of the maintenance, care and treatment of the inmates of said institution and for any clothing furnished by the state, and funeral expenses, from the estate of such inmate or from any person who by law is bound to provide for and support such inmate." (Gen. Stat. 1909, §§ 8457, 8459.)

It is clear that from the passage of this act until the death of Belle Abbott—a period of about seven months—her estate was liable for the cost of her maintenance. In behalf of the plaintiff it is contended that the statute is retroactive, and by its terms enables the state to demand reimbursement for expenditures already made. Whether it would be competent for the legislature to impose such a liability where no legal obligation had previously existed need not be considered. An act is to be deemed to operate only prospectively unless the contrary clearly appears. (36 Cyc. 1205.) Here the only phrase employed that could be regarded as suggesting a purpose to demand reimbursement for expenses incurred by the state prior to the new enactment is that authorizing a recovery "at any time" for the cost of maintenance. As we have interpreted the law the new statute does not merely provide a procedure for enforcing an obligation already existing. It creates a liability from conditions which previously imposed none, and also provides for its enforcement. The phrase "at any time" relates to the latter aspect. It is given sufficient field of operation by construing it to mean that after an obligation shall have arisen under the operation of this statute a recovery may be had "at any time." If the intention had been to impose a liability on account of conditions

already existing, language would naturally have been selected making that purpose plain.

It remains to consider the effect of the commitment of Belle Abbott to the asylum for the insane, and of her retransfer to the Winfield institution. The defendant maintains that the order of the probate court of Cowley county declaring her insane was void for want of jurisdiction, she being a resident of Johnson county, and that therefore no liability should attach to her estate by reason of her having been cared for at the Topeka asylum. The plaintiff contends that she was properly adjudged insane, that thereafter no real change in her condition took place, and that none was declared by competent authority in a regular way; that she was placed in the asylum at Winfield to receive treatment suited to one suffering from insanity, and that her estate was liable under the statute relating to the care of the insane, not only while she was at Topeka, but to the same extent after she had been returned to Winfield. In some situations the validity of an order of commitment to a hospital for the insane may well have a bearing upon the question of the patient's liability for the expense of maintenance. But here the subject of inquiry was beyond doubt of unsound mind, whatever term may best be employed to express the character of her affliction. She was properly a ward of the state. During the time she was maintained at the Topeka asylum we think her estate should be liable for the outlay in her behalf, notwithstanding the requirements for her commitment there may not have been complied with. And by similar reasoning we conclude that while actually an inmate of the Winfield institution her estate should be exempt from liability, notwithstanding any irregularity in her retransfer. We believe this view best enforces the legislative policy as here interpreted.

The defendant seeks to invoke the statute of limitations. The function of maintaining an asylum for the

insane is governmental, and the statute does not run against the state with respect to a claim in connection therewith. (*Eastern State Hospital v. Graves,* 105 Va. 151, 52 S. E. 837, 3 L. R. A., n. s., 746.)

A modification of the judgment is therefore directed so as to exempt the estate of the decedent from liability during the time that she was cared for at Winfield, except for the period subsequent to the amendment of 1909.