No. 24,797.

HANNA WITT, *Appellee*, v. JOHN C. HEYEN, *Appellant*.

SYLLABUS BY THE COURT.

1. BREACH OF PROMISE OF MARRIAGE—*Statute Prohibiting Marriage of Certain Persons Valid Exercise of Legislative Power*. Section 6155 of the General Statutes of 1915, prohibiting the marriage of a woman, whose parent was insane at the time of her birth, before she reaches the age of forty-five years, is a valid exercise of legislative power.

2. SAME—*Prohibited Marriages—No Basis for Damages for Breach of Promise of Marriage*. The breach of an agreement to marry, between parties whose marriage is prohibited by statute, will not form the basis of an action for damages.

3. SAME—*Evidence—No Consent to Breach of Promise*. Evidence examined and held to support a finding that plaintiff had not consented for defendant to breach the promise of marriage.

4. SAME—*Taint of Insanity in Plaintiff May Be Shown in Mitigation of Damages.* In an action for damages for breach of marriage promise, undesirable traits or objectionable characteristics of plaintiffs, including taint of insanity, if pleaded by defendant, may be shown in mitigation of damages.

5. SAME—*Lunacy Inquest—Verdict and Findings of Jury Competent Evidence as to Insanity of Plaintiff's Father.* In a lunacy inquest, under section 3681 of the General Statutes of 1889, the jury was required to include in their verdict the substantial facts shown by the evidence, a finding of the duration of the disease prior to the inquest, and a statement of all facts bearing on the case known to the physician juror.

6. SAME—*Prima Facie Evidence of Insanity.* In such a case, where the jury find the subject to be insane, and that the disease had existed from a prior date, the finding is conclusive evidence of insanity at the date of the inquest, and *prima facie* evidence of insanity during the prior period overreached by the findings.

7. SAME—*Binding Effect of Lunacy Inquest.* A lunacy inquest, under the statute mentioned, is a proceeding on the part of the state, in its capacity as *parens patriae,* for the welfare of its citizens, and is binding alike upon all persons.

Appeal from Stafford district court; DANIEL A. BANTA, judge. Opinion filed December 8, 1923. Reversed.

*Paul R. Nagle,* of St. John, for the appellant.

*Robert Garvin, Evart Garvin,* and *Ray H. Beals,* all of St. John, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: This is an action for damages for breach of promise of marriage. There was a jury trial, judgment for plaintiff, and the defendant appealed. The petition contained the necessary allegations for such an action. The answer admitted the engagement but averred (*a*) that the promise of marriage had been broken by mutual consent, and (*b*) that after the promise of marriage defendant learned there was insanity in plaintiff's family, that he inquired of plaintiff about her father, but she would tell nothing and concealed from him the family Bible, or other record, containing her family history; that from other sources he learned that her father was insane, as was also her father's half-sister; that her father had died April 8, 1907, of pulmonary tuberculosis, at one of the state hospitals for the insane, and pleaded that plaintiff's father was adjudged insane in the probate court of Rush county, November 11, 1895, and by reason thereof he became obsessed with the idea that, should he marry plaintiff, their offspring would become insane, or would be

Witt v. Heyen.

imbeciles, or consumptives, and being fearful that the offspring would inherit the taint of plaintiff's family, and knowing that both insanity and consumption are hereditary, he could not bring himself to carry out his promise, and averred that because of the reasons which prompted him he should not be required to respond in damages. The verified reply admitted that when plaintiff was about nine months old her father was adjudged insane, was committed to the state hospital for the insane and later died there, denied that the insanity was of a hereditary nature and denied other allegations of the answer.

As to the first defense pleaded, that the promise of marriage had been broken by mutual consent, the jury in answer to a special question found against the defendant. On this branch of the case, the defendant relied upon certain letters written by plaintiff, in which she said: "So you think I have another 'beau.' Well, I certainly have not; did not intend to, unless you say so. Suppose you would rather have some one else to talk to, do not blame you for that. I had not intended to go with any one else and more I would not break the promise that I once gave you unless I have to. . . . If you think I am going with some one else you are mistaken for I am not, and if you don't want to keep company with me let me know and I will return the things you gave me. It was not my intention to quit, but if you think so then it probably must be, but just as you say for my feelings were hurt . . ." And in another letter: ". . . . So you think I don't love you, I do, just as much as I always did, if I didn't I wouldn't told you so Xmas, but if you think I don't and would·rather be alone; don't let me hinder you, for I don't want to cause hard feeling or be in any one's way." Appellant asks us to construe these letters as expressing a consent on her part to the breaking of the engagement. We think they are not susceptible of that interpretation.

In *Nightingale v. Leith,* 120 Maine 501, a letter, written by plaintiff to defendant after he had asked for the return of the engagement ring, contained this sentence: "But as I see that you don't care for me and want to call it off you may. I don't want to thrust myself on any one" (p. 504), was held not to show a rescission by mutual consent of the contract to marry. In view of some parol testimony, the trial court in this case left the question to the jury. Their special finding against the defendant is well supported by the evidence and is final on that question.

The questions arising out of the second defense are not so easily disposed of. Sections 6155 and 6157 of the General Statutes of 1915, as amended by chapter 230 of the Laws of 1919, read as follows:

"No woman under the age of forty-five years, or man of any age, except he marry a woman over the age of forty-five years, either of whom is epileptic, imbecile, feeble-minded or afflicted with insanity, shall hereafter intermarry or marry any other person within this state. It shall be unlawful for any person to marry any such feeble-minded, imbecile or epileptic person, or anyone afflicted with insanity. Children born after a parent was insane shall not marry except under the above-named conditions, unless the parent or parents of such children shall have been discharged from the State Hospital for insane or any other legally constituted institution for the treatment of the insane more than nine months before the birth of the child, as cured and remained cured for a period of twenty years after such discharge."

"No officer authorized by law to issue marriage licenses in this state shall hereafter issue such a license to any persons, either of whom is afflicted with any of the diseases mentioned in section 1 of this act, knowing them to be so afflicted, unless the female party to such marriage is over the age of forty-five years, but said officer shall in all cases ask of the party applying for a marriage license and require him to make answer thereto in writing under oath to the following question: Have you or has the person you are expecting to marry ever been afflicted with epilepsy, imbecility, feeble-mindedness, or insanity?"

Plaintiff was born February 16, 1895, and was about twenty-seven years of age at the time of the trial; hence, the above statute applies to her, if her father was insane at the time of her birth. Defendant's answer must be construed favorably to him to say that he plead a defense under this statute, but the trial court did not base his ruling upon the lack of the sufficiency of the answer and perhaps we should not do so; for, it was within the discretion of the court to permit an amendment to the answer, even though justice to the other side would require a continuance. The answer did not specifically plead that plaintiff's father was insane at the time of her birth, but it did plead the adjudication of insanity of plaintiff's father by the probate court of Rush county, on November 11, 1895, which adjudication tended to show that fact. At the trial defendant offered in evidence, from the records of the probate court of Rush county upon the inquest of the insanity of plaintiff's father, John Witt, the following: The order of the court of November 9, 1895, reciting that an information had been filed alleging that John Witt was a person of unsound mind and incapable of managing his affairs, and praying an inquiry; it set the hearing for November 11, directed the sheriff to bring John Witt into court, and summoned six jurors, one of whom

was a physician. The journal of the court of November 11, 1895, of the hearing, which recited the presence of John Witt; that the jury was chosen, witnesses called, evidence introduced, that the jury returned the following verdict:

"We the undersigned jurors, in the case of John Witt insane having heard the evidence in the case are satisfied that said John Witt is insane and is a fit person to be sent to the State Insane Asylum; that he is resident of the State of Kansas, and Rush County, that his age is 40 years; that the disease is of two years duration, that the cause is supposed to be melancholia with him heriditary, that he is not subject to epilepsy, that he does not manifest homicidal tendencies." (Signed by jurors.)

This is followed by the judgment of the court that "John Witt is a person of unsound mind and incapable of managing his affairs," and the order committing him to the state hospital for the insane. Also the "Statement in Lunacy," consisting of questions and answers, those material to defendant being:

"5. When were his first symptoms of his disease manifested, and in what way? Two years ago.

"6. Is this the first attack? If not, when did others occur, and what were their duration? No; has been insane for two years.

"14. What relatives including grandparents and cousins have been insane? One half-sister."

Plaintiff objected to these records for the reason that in her reply she had admitted that her father was adjudged insane when she was about nine months old, and on the trial admitted the date of the adjudication, and for the reason that the record offered contained evidentiary matters not properly a part of the judgment itself and which were prejudicial to plaintiff. The court sustained plaintiff's position in the main, and so far as they could be separated admitted in evidence only that portion of the record showing the judgment of the court; and entirely excluded the "Statement in Lunacy." Appellant complains of this ruling, and we think it was erroneous.

The statute under which the trial was conducted at the inquest is section 3681 of the General Statutes of 1889 (Laws 1876, ch. 91), which reads as follows:

"At the time fixed for the trial, a jury of six persons, one of whom shall be a physician in regular practice and good standing, shall be impaneled to try the case, . . . The person alleged to be insane shall have the right to be present at the trial, to be assisted by counsel, and to challenge jurors as in civil cases. . . . After hearing the evidence, the jury shall render their verdict in writing, signed by them, which shall embody the substantial facts shown by the evidence, which verdict, in the case of a person found to be a lunatic, shall be substantially in the following form:

" " 'State of Kansas, ——— County, ss.

"We, the undersigned, jurors in the case of (naming the person charged to be insane), having heard the evidence in the case, are satisfied that said ——— is insane and is a fit person to be sent to the state insane asylum; that he is a resident of the state of Kansas and county of ———; that his age is ——— years; that his disease is of ——— duration, dating from ——— first symptoms; that the cause is supposed to be ——— (or unknown); that the disease is (or is not) with him hereditary; that he is (or is not) subject to epilepsy; that he does (or does not) manifest himicidal or suicidal tendencies.'

"Which verdict shall be signed by all the members of the jury; and to which verdict shall be attached a brief statement of the medical treatment in the case, as near as the same can be ascertained, which statement, together with any other information or circumstances known to him, and which may tend to throw light on the case, shall be signed by the physician or physicians upon the jury. Upon the return of the verdict, the same shall be recorded at large by the probate judge, and if it appear that the person is insane, and is a fit person to be sent to the insane asylum, the court shall enter an order that the insane person be committed to the state insane asylum; . . ."

It will be noted that the statute requires the jury to return a verdict "which shall embody the substantial facts shown by the evidence," and sets out a form of verdict which is the form used in this case; and to this verdict shall be attached a brief statement of "the medical treatment" and any "information or circumstances" which tend to throw light upon the case, which is the "Statement in Lunacy" in this case. The verdict shall be recorded "at large," which we construe to include the statement required by the statute to be attached to the verdict.

A brief history of inquest for lunacy may assist us to understand the form and effect of the findings. Inquests in lunacy came to us from the common law. By 17 Edw. II, ch. 9, it was provided that "the king shall have the custody of the lands of natural fools (idiots), taking the profits of them without waste or destruction, and shall find them in necessaries, of whose fee so ever the land be holden." And chapter 10 provided for lunatics, or such as might have lucid intervals, by making the king a trustee of their lands and tenements, without beneficial interest, as in the case of idiots. This statute continued in force from 1324 to 1863. (Ordronaux, Jud. Aspects of Insanity, p. 4.) The procedure was, when the king was informed that one was an idiot or a lunatic, he issued his writ to the escheator or sheriff to inquire thereof. Subsequently authority was given to the chancellor to issue the writ, and the procedure was by petition suggesting the lunacy. It was the ordinary writ upon a supposed forfeiture to the crown and the proceedings were instituted

in behalf the the king as the political father of his people, and was necessary before the soverign could divest title (3Bl. Com. 259), and the nature of the title vested in the king, whether a beneficial interest, or merely trustee, was determined by the findings of the inquest on the nature and duration of the lunacy. In this country after the revolution the care and custody of persons of unsound mind, and the management of their estates, which had belonged to the king, became vested in the people in their sovereign governmental capacity, and was exercised first by chancellors in courts of equity. In this country, in some of the states there was for some time no statute outlining procedure for the hearing (New York had none for one hundred years, *Hughes v. Jones,* 116 N. Y. 67), the right to conduct the hearing being inferred from the right and duty of the state to the care of the lunatic and his estate. Later, statutes were enacted placing the hearing in probate or other suitable courts, and prescribing a procedure (22 Cyc. 1120). Thus it is seen that an inquest in lunacy has always been a proceeding on behalf of the sovereign, and the findings of the commission, or jury, or court, as the case may be, are, similar to judgments in criminal cases, binding upon all persons alike, except that they may be more binding upon the one who is adjudged insane. *Forna v. Haley,* 73 Kan. 633, 85 Pac. 751; 86 Pac. 470; *Hughes v. Jones,* 116 N. Y. 67; *People, ex rel., v. B. & A. Hospital,* 235 N. Y. 398.

As to the effect of a finding of insanity under a statute similar to our chapter 60 of the General Statutes of 1889, it has been generally held that the finding is *prima facie* evidence of insanity, or incompetency, during the period overreached by the findings, but is not conclusive, and may be rebutted by other evidence. 22 Cyc. 1133. In *Hopson v. Boyd,* 6 B. Mon. (Ky.) 296, 297, it was said:

". . . the doctrine seems to have been settled in England, and to have been recognized in this as well as other states, that an inquisition finding the person named to have been of unsound mind from a preceding day is admissible as evidence of his incompetency during the period indicated, . . . But it has been held not to be more than *prima facie* evidence as to the past condition of the person."

*In re Coleman,* 88 N. J. Eq. 284, the finding of lunacy was made November 3, 1916, and that subject was *non compos mentis* for seventeen months prior thereto. The question arose as to his competency to make a will in October, 1915. It was held the finding raised a presumption against the validity of the will, one which was not conclusive and which may be rebutted.

In *Yauger v. Skinner,* 14 N. J. Chan. 389, where one who had executed a conveyance was afterwards found to be insane from a time anterior to the date of the conveyance, it was held to cast a sufficient cloud upon the title to enable the purchaser to maintain a bill for relief in the nature of a bill *quia timet.* To the same effect is *Mott v. Mott,* 49 N. J. Eq. 192.

In New York it was uniformly held that contracts made by a person adjudged insane, before such adjudication but within the period overreached by the finding of the jury, though not void are presumed to be so until capacity to contract is shown by satisfactory evidence; *Van Deusen v. Sweet,* 51 N. Y. 378; *Banker v. Banker,* 63 N. Y. 409; *Hughes v. Jones,* 116 N. Y. 67; *Dominick v. Dominick,* 20 Abb. New Cases (N. Y.) 286, though under a later statute limiting the inquiry to the time of the hearing, the finding has no prior effect. (*In re Preston's Will,* 99 N. Y. Supp. 312.)

In *Chase v. Spencer,* 150 Mich. 99, and *Bond v. State,* 129 Tenn. 75, the findings of the inquest were held properly received in evidence. In *Princhett v. Thomas Plater & Co.,* 232 S. W. 961 (Tenn.), a judgment declaring a person insane is conclusive evidence of insanity at the date of the judgment and *prima facie* evidence of such fact from the time the jury found him to be insane until the date of the judgment.

The term insane, as used in the statute under which the inquest in this case was had, signifies bereft of reason, a lunatic, and not a mere mental strain or brain sickness. (*In re Wright,* 74 Kan. 406, 409, 413, 86 Pac. 460, 89 Pac. 678.)

From the above authorities it seems clear that the record of the inquest proceedings of plaintiff's father, including the "Statement in Lunacy," should have been received in evidence. The record makes a *prima facie* showing that plaintiff's father was insane at the time of her birth (though this might be overcome by other evidence), and, for that reason, the parties not competent to marry under section 6155 of the General Statutes of 1915. Appellee argues that this statute is void as making an unreasonable restriction on the inherent right of marriage, but we are unable to concur in that view. It is within the province of the state to prescribe reasonable regulations relating to marriage (*State v. Walker,* 36 Kan. 297, 304, 13 Pac. 279), and to prohibit the marriage of first cousins (*Reed v. Reed,* 49 Oh. St. 654), a nephew and aunt (*Campbell v. Crampton,* 2 Fed. 417), and those not free from well-known injurious diseases

*(Peterson v. Widule,* 157 Wis. 641). (See, also, *Kirby v. Kirby,* 206 Pac. 405 [Ariz.], and *Ross v. Bryant,* 217 Pac. 364 [Okla.]). And an agreement to marry between persons who, under the statute, are prohibited from marrying may be breached without incurring liability for damages. (*Reed v. Reed* and *Campbell v. Crampton,* supra.) In breach of promise cases damages will not be allowed if the ill health of plaintiff (*Grover v. Zook,* 44 Wash. 489; *Travis v. Schnebly,* 68 Wash. 1; *Fellers v. Howe,* 106 Neb. 495; *Beans v. Denny,* 141 Iowa, 52; *Kantzler v. Grant,* 2 Ill. App. 236; *Goddard v. Wescott,* 86 Mich. 180; *Gring v. Lerch,* 112 Pa. St. 244; *Walker v. Johnson,* 6 Ind. App. 600), or of defendant (*Allen v. Baker,* 86 N. C. 91; *Gardner v. Arnett,* 21 Ky. L. 1; *In re Estate of Oldfield,* 175 Iowa, 118; *Shackelford v. Hamilton,* 93 Ky. 80; *Sanders v. Coleman,* 97 Va. 690; *Trammell v. Vaughan,* 158 Mo. 214), is such that the injurious effects of the marriage of the parties upon themselves, their children, and upon society, would be obviously disastrous, even though the statute does not specifically prohibit the marriage. These cases, however, refer to the ill health of one, or both, of the contracting parties, and not to the parent of one of the parties, as attempted here to be applied. And most of the cases are based upon the fact that the ill health was unknown, or thought to be cured, at the time of the promise. In *Lemke v. Franzenburg,* 159 Iowa, 466, it is specifically held that the ill health of plaintiff known to defendant at the time of the promise, is no defense. But in *Grover v. Zook,* 44 Wash. 489, the ill health of plaintiff, from pulmonary tuberculosis, was such that, though defendant knew of the disease at the time of promise, he was excused from performance. Through all these cases runs the doctrine, always recognized and frequently applied, that the state, or society at large, is the third party to every marriage contract. That marriage between parties within certain degrees of relationship, or under certain conditions of health would be so opposed to the legitimate objects and purposes of matrimony, and the influence upon society so detrimental, that the state may prohibit, or, if damages be sought for the breach of a promise to marry, relief will be denied.

As applied to this case, the state has said that the plaintiff cannot marry before she reaches the age of forty-five years, if her father became insane before her birth. If the evidence should establish that fact the defendant should not be held in damages. From the remarks of the trial court, in passing upon the motion for a new trial,

it is evident he took the view that the defendant should be required to respond in damages, though it should be established that the marriage would be in opposition to our statute. Two cases are found tending to support this view, *Hall v. Wright,* E. B. & E. 765, an early English case, and *Smith v. Compton,* 67 N. J. L. 548, but they are criticized in many of the authorities heretofore cited and we do not concur in their reasoning.

In this case there is no claim that ill health of the plaintiff, other than the taint of insanity in her family, or of the defendant, would justify defendant in breaching the promise of marriage which he admits he made. Unless he can show, and the burden in this respect is upon him, that plaintiff's father was insane at the time of her birth, he cannot be relieved of liability. That is the yardstick the statute has made and both parties must be bound by it.

Even though defendant is not able to relieve himself from liability by showing that plaintiff's father was insane at the time of her birth, the evidence pertaining to the insanity of plaintiff's father is competent in mitigation of damages. In a similar case, *Lohner v. Coldwell,* 15 Tex. Civ. App. 444, defendant was not permitted to offer, in mitigation of damages, evidence of a taint of insanity in plaintiff, but that was because it had not been pleaded as a defense; here the defendant pleaded it. It is the general rule that the circumstances of the parties, including traits and history of plaintiff's family, are admissible in evidence, in mitigation of damages. (9 C. J. 359.)

In addition to his offer of evidence, appellant preserved the questions here discussed, by special questions and instructions requested, and by objection to instructions given, but we do not deem it necessary to discuss them separately. From what has been said our holdings thereon are obvious.

The cause will be reversed for a new trial upon the second defense, in accordance with this opinion.