No. 46,360

In Re: Conservatorship of James B. Richards, State Department of Social Welfare of Kansas, *Appellee*, v. Mildred Richards, Conservator of Estate of James B. Richards, *Appellant*.

(496 P. 2d 1287)

Opinion filed May 6, 1972.

*Robert E. Davis*, of Leavenworth, argued the cause and was on the brief for the appellant.

*J. J. B. Wigglesworth*, attorney for the state department of social welfare, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

Foth, C.: The issue in this case is whether the state department of social welfare may recover from the estate of a conservatee the cost of his maintenance, care and treatment while confined in the state security hospital at Larned pursuant to a commitment issued by a district court when he was found incompetent to stand trial on a pending criminal charge.

The conservatee, James B. Richards, was found incompetent to stand trial and committed under former K. S. A. 62-1531 for "safe-keeping and treatment" until he was able to stand trial. He remained at the Larned state hospital from October 27, 1965 to September 1, 1969. The state department of social welfare ("the state") thereafter filed a claim in his conservatorship estate in the probate court of Leavenworth county for his "maintenance, care, and treatment" during that period. The probate court allowed the claim only to the extent of an unspecified amount for the "cost of proceedings and transportation and clothing."

The state appealed to the district court, which stated in its memorandum opinion:

"The facts of this case are not in dispute. The patient in question was committed to the Larned State Hospital under the provisions of K. S. A. 62-

1531. The petitioner bases its claim upon K. S. A. 59-2006, as amended. The conservator contends that the provisions of K. S. A. 76-2463 limit the amount of petitioner's recovery to the costs of the proceedings, and transportation and clothing.

"It is the conclusion of this Court that the present provisions of K. S. A. 59-2006, the provisions of this statute as it was worded in 1965, and the provisions of K. S. A. 59-2006a, now repealed, make it clear that the State Department of Social Welfare may recover the cost of the maintenance, care and treatment of a patient committed to the Larned State Hospital under the provisions of K. S. A. 62-1531. This Court concludes further than the provisions of K. S. A. 76-2463 *as amended and the provisions of* K. S. A. [5]9-2006 *as amended are not in conflict.* . . ."

Judgment was entered accordingly, allowing the state's full claim of $10,598.31, and the conservator appeals.

The conservator urges, and the probate court agreed, that the patient's liability should be limited to those items mentioned in K. S. A. 76-2463:

"The costs of the proceedings, and transportation and clothing of an insane person committed by the court under K. S. A. 62-1531, 62-1532, 62-1533 and 62-1534, shall be paid out of the estate of such person, or by relatives bound by law to maintain him, or by the county, as in the case of mentally ill persons sent to the state hospitals."

She argues that the express provisions of this statute, dealing specifically with a limited class of mentally ill persons, should prevail over the general provisions of K. S. A. 59-2006 (as amended), dealing with mentally ill persons in general.

The state, on the other hand, points to the language of K. S. A. 59-2006 which in 1965 provided "Payment for the maintenance, care and treatment of any patient shall be paid quarterly by said patient, by the guardian of his estate, or by any person bound by law to support him." A 1967 amendment changed this sentence only by substituting "conservator" for "guardian." ( Laws 1967, ch. 474, § 1.) In 1969 it was further amended to insert that payment should be made by or for the patient "irrespective of the manner of his admission." (Laws 1969, ch. 281, § 1.) The state finds no conflict between this provision requiring payment for *any* patient's "maintenance, care and treatment" and that of 76-2463 requiring payment of "the costs of the proceedings, and transportation and clothing" of those patients committed as an incident to criminal proceedings. This, as noted, was the view of the district court.

Our analysis of these positions starts with the history of this state's policy toward the expense of caring for those involuntarily

committed to its mental institutions, from which we believe a dispositive pattern emerges. The early years were summarized in *Kaiser v. State,* 80 Kan. 364, 372-3, 102 Pac. 454:

". . . The earliest enactment bearing upon the matter was chapter 92 of the Laws of 1859, which remained in force until repealed by section 1 of chapter 299 of the Laws of 1905. This act provided that the probate court should make an order for the 'restraint, support and safe-keeping' of any person who should be 'so far disordered in his mind as to endanger his own person or the person or property of others,' the expense to be paid by the guardian out of his estate, or by the person under obligation to support him, or in default of this by the county, in which case a right of reimbursement should accrue against any one bound for his maintenance. These provisions, although not directly determinative of the question here involved, are important as showing *the policy of the state from the time of its organization to have been to hold individuals liable for the cost of caring for insane persons who are restrained primarily for the common good and the expense of whose maintenance has been borne in the first instance by the public.*" (Emphasis added.)

The emphasized language bears directly on the conservator's policy argument that a criminal defendant should not bear the expense of pre-trial commitment which, she alleges in her brief, is for the "protection of society" and not for the benefit of the patient. The same argument could well be made as to any involuntary commitment for mental infirmity—the dual interests of the individual and the sovereign in such proceedings are apparent and have long been recognized. See, *e. g.,* 44 C. J. S., Insane Persons, § 8, p. 56. See also, *Witt v. Heyen,* 114 Kan. 869, 221 Pac. 262, where the public interest in "lunacy" proceedings was traced from 17 Edw. II, a statute in effect from 1324 to 1863. While, as was there said (p. 875), "an inquest in lunacy has always been a proceeding on behalf of the sovereign," yet Kansas has always placed the burden of supporting the "lunatic" on available private sources, as noted in *Kaiser v. State,* supra. Arguments going to the wisdom of that legislative policy are misdirected when pressed upon this court.

In 1907 the laws relating to persons admitted to the state hospitals were revised to provide in part that "the state may recover the per capita cost of the maintenance, care and treatment of the inmates . . . from the estate of such person or from any person who by law is bound to provide for and support such person." (Laws 1907, ch. 247, § 32.) Section 33 of the same act provided:

"The following relatives shall be bound by law to provide for and support the persons referred to in sections 31 and 32 of this act: The husband for the wife and the wife for the husband, the parent for his or her children, and the children for their parents."

The substance of these two provisions has been carried forward to today's K. S. A. 1971 Supp. 59-2006. Section 33 became the first sentence of the present section, declaring who is liable for support of a patient, and also defining which patients are covered. The course of this sentence will be discussed later in this opinion.

The first time the legislature turned its attention specifically to the plight of those mentally ill persons who were especially dangerous or whose condition had led them to become embroiled with the criminal law was apparently in 1911. Cf., *In re Clark,* 86 Kan. 539, 547-8, 121 Pac. 492.

The legislature of that year enacted a comprehensive scheme for dealing with this special category of the mentally ill, Laws 1911, chapter 299, the basic feature of which was the creation of a new institution, the forerunner of today's state security hospital. Section 1 directed the penitentiary officials to establish the "State Asylum for the Dangerous Insane" on the premises and as part of the state penitentiary at Lansing. It was to receive persons "committed thereto by the courts of criminal jurisdiction" or transferred from the penitentiary, reformatory or state hospitals.

Section 2 authorized the warden of the penitentiary or superintendent of the reformatory to take inmates alleged to be insane before the probate court for examination "as in the case of other insane persons." If found to be insane, the inmate was to be ordered by the probate court to be transferred to the "State Asylum for the Dangerous Insane."

Section 3 authorized the administrative transfer to the "Asylum" of inmates of any state hospital who were found "to have homicidal tendencies, or to be under sentence or indictment or information, or whose presence is dangerous to the other inmates of said institution."

Section 4 provided for the commitment by the court in which a criminal action was pending of defendants found to be incompetent to stand trial.

Section 5 provided for the commitment of those defendants found not guilty by reason of insanity.

Section 6 dealt with the expenses of both transferring and committing inmates to the new institution. It provided:

"The expense of the transfer of any insane person to the State Asylum for the Dangerous Insane from any of the state institutions mentioned shall be paid out of the estate of such person or by relatives bound by law to maintain him, or out of the funds of said institutions upon duly verified vouchers approved by the board, or boards, in charge of such institutions; and the costs of the proceedings, and transportation and clothing of an insane person committed by the court under sections 4 and 5 of this act shall be paid out of the estate of such person, or by relatives bound by law to maintain him, or by the county, as in the case of insane persons sent to the state hospitals for the insane."

The 1923 revision of our statutes resulted in a splitting up of the 1911 act. Sections 4 and 5 were placed in the code of criminal procedure, where they became §§ 62-1531 and 62-1532. There they remained, with only minor changes, until repealed when our new code of criminal procedure was enacted (Laws 1970, ch. 129).

Sections 1, 2, 3 and 6 were placed in the article relating to the penitentiary, and became respectively §§ 76-2460, 2461, 2462 and 2463. Their remnants may be found in that article today, although in 1945 the institution to which they relate was removed to Larned and became part of the Larned state hospital (Laws 1945, ch. 345, § 1). In 1949 it fell under the jurisdiction of the state department of social welfare and its name was changed to the "state hospital for the dangerous insane" (Laws 1949, ch. 323, §1). In 1963 it acquired its present name, the "state security hospital" (Laws 1963, ch. 254, § 3).

In 1965 the legislature narrowed the function of the state security hospital to the reception of only those persons committed by "courts of criminal jurisdiction" and those transferred from an institution under the supervision of the director of penal institutions. (Laws 1965, ch. 499.) Since January 1, 1966, the effective date of that act, only persons who have run afoul of the criminal law have been subject to confinement in that institution. Inmates of other state hospitals, whether "dangerous" or not, are no longer subject to being transferred to it.

As part of this 1965 revision of the institution's function, the expense-of-transfer provisions of 76-2463 were inserted in 76-2461 (the section authorizing transfer from penal institutions) and the financial burden of the transfer was placed on the transferring

institution; section 76-2462, which had authorized transfers from other state hospitals, was repealed; and 76-2463 was amended to its present form by deleting the expense-of-transfer provisions and leaving only those dealing with expenses incurred in commitments from courts of criminal jurisdiction.

In all of these statutes and amendments relating to what is now the state security hospital nothing was said about the expense of a patient's maintenance, care and treatment after he became an inmate; they spoke only to the expense of getting the patient to the institution. During the entire period the operational expenses of the state hospitals were dealt with separately in what became section 59-2006.

By the time of the adoption of the 1939 probate code the state could recover for maintenance, care and treatment of patients in "a state hospital" (Laws 1939, ch. 180, § 170). That term was defined so as to include named hospitals, but not the "State Asylum for the Dangerous Insane" (Id., § 165 [3]; subsequently K. S. A. 59-2001.)

In 1951 the expenses of the hospital for the dangerous insane caught the legislative eye. In an act (Laws 1951, ch. 340) generally devoted to raising the rate to be charged for care in the state hospitals, the legislature in sections 1 and 2 amended G. S. 1949, 59-2003 and 2006; in section 3 it specifically provided: "The provisions of this act shall extend to and include patients in any hospital for the dangerous insane." Section 3 became K. S. A. 59-2006a (later repealed).

At this point the definition of a "state hospital" found in 59-2001 and incorporated by reference in 59-2006 still did not include the Larned criminal facility, but it was clear that, despite that omission, patients in the criminal wing were liable for their keep.

This court so held in In re Estate of Hockett, 177 Kan. 507, 280 P. 2d 573. The patient there had first been committed before trial under 62-1531. He was later returned to the committing court where he was convicted and sentenced to the penitentiary. While there he was found "insane" and transferred to the state hospital for the dangerous insane under 76-2461 which, as it then read, required a probate court order. The state filed a claim against his estate for his "maintenance, care and treatment" during both periods, which was allowed. His guardian didn't appeal the claim for pre-trial confinement under 62-1531, but did question liability for the expense of post-sentence confinement after transfer under 76-2461. (Both

sections, it will be recalled, were part of the 1911 act establishing the original "State Asylum for the Dangerous Insane.")

This court remarked on the provisions for expense-of-transfer, then still contained in 76-2463:

". . . It is true the cost of the hearing in the probate court as well as the transportation of Mr. Hockett to the Larned State Hospital was to be paid by the state penitentiary, but after he was received at the hospital he was to be kept and maintained in the hospital as other patients. This means, of course, the same as patients who were not prisoners but who had been adjudged insane." (Id., at p. 511.)

As to the patient's upkeep, the court went on to hold (pp. 511-12):

"Sections 59-2006 and 59-2006a of the 1951 and 1953 Supp. to the General Statutes of 1949 are parts of ch. 340, L. 1951, which became effective July 1, 1951. Sec. 59-2006 was an amendment of the section of the same number in our General Statutes of 1949, the pertinent portions of which read:

[Quotation omitted.]

"Sec. 3 of the act, now § 59-2006a of the above supplement, reads:

" 'The provisions of this act shall extend to and include patients in any hospital for the dangerous insane.'

"The State Department of Social Welfare of Kansas has the supervision of all the Kansas State Hospitals. Our penal institutions, including the state penitentiary, are under the jurisdiction of the State Board of Administration [now the director of penal institutions] and appropriations made made accordingly. It is to be noted that G. S. 1949, 76-2461, above quoted, does not require the state penitentiary or the State Board of Administration to pay for the keep of a prisoner who is found to be insane and who is committed by the probate court to the state hospital for the dangerous insane. Such a prisoner so committed 'shall be kept and maintained as in the case of other patients'. *If there ever was any question about that, what is now § 59-2006 and 59-2006a, supra, made it clear that the State Department of Social Welfare may recover the cost of such maintenance, care and treatment.*" (Emphasis added.)

If a patient *transferred* to the security hospital from the penitentiary under 76-2461 (Section 2 of the 1911 act) must support himself, we see no reason why a patient *committed* to the same institution under 62-1531 (section 4 of the same act) should not bear the same burden. Legislative provision is made in either instance for the cost of getting him there, but that does not foreclose the further provisions for the cost of keeping and treating him after he arrives.

Legislative action since the *Hockett* case reinforces this conclusion. Section 59-2006a was repealed, but 59-2006 was simultaneously amended to include among the patients who must be privately supported, if possible, those at "the state security hospital" (Laws

1967, ch. 474, §§ 1 and 4). Further refinement of the legislative intent was accomplished in Laws 1969, ch. 281, § 1. The duty to support was made applicable to "persons committed to, *admitted to, transferred to,* or received as patients at the state hospitals, the state security hospital . . . all hereinafter referred to in this act as state hospitals." Support payments were required for "the maintenance, care and treatment of any patient *in a state hospital irrespective of the manner of his admission."* (Italics in the original, indicating new matter.)

To summarize: (1) we have had a legislative policy from 1859 to the present that the state should recoup from private sources where available the cost of maintaining patients in the state's mental institutions; (2) from 1911 until 1951 special provision was made for the cost of committing or transferring patients to the state security hospital and its predecessor, but no provision was made for recovering the cost of their subsequent upkeep; (3) in 1951 the legislature clearly declared that the recoupment provisions of 59-2006 should apply to patients in the state security hospital, and they and those bound to support them should thereafter be liable for their maintenance, care and treatment. This was the result reached in *Hockett,* and remains unchanged.

We therefore concur in the view of the district court that sections 76-2463 and 59-2006 are not in conflict, and that the latter imposes an obligation on a patient at the state security hospital to pay, within his available resources, for his maintenance, care and treatment.

The judgment is affirmed.

APPROVED BY THE COURT.