STATE *v.* ALEXANDER IKEY'S ESTATE.

January Term, 1911.

Present:  ROWELL, C. J., MUNSON, WATSON, HASELTON, AND POWERS, JJ.

Opinion filed May 5, 1911.

*Insane Persons—Not Indicted on Account of Insanity—Status— Liability for Support—Custody and Support—Liability of Public Authorities—After Acquired Property.*

Where one charged with the crime of murder was not indicted because of his insanity, and thereupon the court, considering that his discharge would be dangerous to the community, committed him to the insane asylum under the provisions of P. S. 2328, his status was not that of a criminal, but only that of other insane persons, and a finding of the court at that time that he had no estate sufficient for his maintenance

and that he should be confined at the expense of the State is not conclusive that the State is liable for his support, but has only the force of a finding to that effect by the probate court under P. S. 3718, providing for the commitment of insane paupers.

The State has the common-law duty to assume the care and custody of the persons and estates of idiots and of those who have lost their intellects, and our statutes show that it is the policy of the State to appropriate the estates of those persons for their maintenance before they shall be supported at public expense, and the Legislature has power to do that.

Whether a substantive right be by common law or by statute, the Legislature may prescribe a particular or new mode of enforcing it.

Where one charged with a crime is not indicted because of his insanity, and thereupon the court, considering that his discharge would be dangerous to the community, commits him to the insane asylum under the provisions of P. S. 2328, his after-acquired property is liable for his support and maintenance, under the provisions of No. 20, Acts of 1890, and No. 105, §§4, 5, Acts 1906.

APPEAL from the decision of commissioners disallowing a claim presented by the State against the estate of Alexander Ikey. Heard on an agreed statement of facts at the March Term, 1910, Rutland County, *Hall,* J., presiding. Judgment, *pro forma,* for the plaintiff. The defendant excepted. The opinion sufficiently states the case.

*T. W. Moloney* and *F. S. Platt* for the defendant.

Money expended in the support of a pauper cannot be recovered of the pauper or his estate without a special contract for re-payment. *Deer-Isle* v. *Eaton,* 12 Mass. 327; *City of Albany* v. *McNamara,* 117 N. Y. 168.

*John G. Sargent, Attorney General,* and *B. L. Stafford, State's Attorney,* for the plaintiff.

WATSON, J. Alexander Ikey, then being held in prison on the charge of having committed the crime of murder, was not indicted by the grand jury at the September term, 1902, of the county court in Rutland County, by reason of insanity, and the grand jury so certified to the court. Whereupon it being con-

sidered by the court that the discharge and going at large of Ikey would be dangerous to the community, and that he had no estate sufficient for his maintenance in the insane hospital, nor in any other suitable place, it was ordered that he be confined at the expense of the State in the Vermont State Hospital for the Insane at Waterbury, until he should be released according to law. These proceedings were in accordance with the provisions of P. S. 2328. Under the order thus made, Ikey was duly committed to the Vermont State Hospital on October 29, 1902, and thus there remained until his death, March 22, 1908, during all which time he was insane. At his decease, Ikey left an estate in this State to the amount of $5,433.99. The State presented for allowance by the commissioners on his estate the claim in question, it being the cost of his maintenance in the hospital during such confinement. From the disallowance of the claim by the commissioners an appeal was had by the State to the county court, and a hearing was there had on an agreed statement of facts, resulting in a judgment *pro forma* for the State to recover the amount of its claim. Exception to the judgment was taken by the defendant, and thereon the case is here.

It is urged that since the county court had complete jurisdiction in determining the question of Ikey's confinement in the hospital for the insane at the expense of the State, and since the State was a party to those proceedings, the finding by the court that he had no estate sufficient for his maintenance in such hospital, nor in any other suitable place, is binding upon the State and upon all the world. At most, however, this finding showed his estate insufficient for such maintenance at that time. He may have had no estate *in praesenti*, and yet have had an estate in expectancy of great value, into the possession of which he might come at any time. For aught that appears he may have had future acquisitions of property by inheritance, or in some other way. When or how he acquired the property owned by him at his decease we are uninformed. However, the inquiry and finding regarding his estate was only for the purpose of fixing his status at the hospital, and was not in contemplation of law an adjudication against the right of the State to charge the expense of his maintenance there against him and

his estate. *Kaiser* v. *Kansas,* 80 Kan. 364, 102 Pac. 454, 24 L. R. A. (N. S.) 295.

It should be had in mind that, though a homicide, Ikey was not a criminal, nor confined as such. In due course of procedure by the State he was adjudged insane and his going at large dangerous to the community, and as such insane person he was confined in the asylum for the insane, not by way of punishment, but because his welfare and the welfare of the community required it. Neither the nature · of his confinement nor his relation to the State under it was different from that of an insane person removed to one of the asylums in the State for the insane under the provisions of P. S. 3718. The fact that the question of his confinement came by statute under the jurisdiction of another court makes no difference in the respects named.

By the common law of England it is the duty of the king to take care of all his subjects who, by reason of their imbecility and want of understanding, are incapable of taking care of themselves. Some distinction is there made, as to property, between an idiot or fool natural, and a lunatic, one who has had understanding, but by disease, grief, or any other cause, has lost the use of his reason. With the law touching the latter class, we have to do in this case. It is said by Lord Coke that if a man who was of sound memory becomes *non compos mentis,* and afterwards aliens his land, or goods or chattels, and afterwards, by office of the king's suit, it is found that he was *non compos mentis,* and that he has aliened, etc., the king shall protect him who cannot protect himself, and shall take the profits of his lands, and of all that he had, and therewith maintain him and his family, but the king shall not take any part of the said profits to his own use; and that all this appears by the statute *De Praerogativa Regis,* 17 Edw. II, Cap. 10, which was but a declaration of the common law. "*Et nota* that the said words of F. N. B. 232, that the king is bound of right by his laws to defend his subjects, and their goods and chattels, lands and tenements, extend as well to *non compos mentis,* as to an idiot." Beverley's Case, 4 Co. Rep. 127 a, 16 Eng. Rul. Cas. 702, 711. Pollack and Maitland in their History of the English Law (Vol. 1, p. 464) say this document known as *Praerogativa Regis* seems to be the oldest that gives any clear information

about a wardship of lunatics. "The king is to provide that the lunatic and his family are properly maintained out of the income of his estate and the residue of it is to be handed over to him upon his restoration to sanity, or should he die without having recovered his wits, is to be administered by the ordinary for the good of his soul; but the king is to take nothing to his own use". Bac. Abr. Tit. Idiots and Lunatics C. Lord Chancellor Lough-borough said this statute was not introductive of any new right of the crown. That the object was to regulate and define the prerogative, and to restrain the abuse of treating the estates of lunatics as the estates of idiots. *Oxenden* v. *Lord Campton*, 2 Ves. Jr. 69, 4 Bro. C. C. 231. And with this agree all the cases, says Chancellor Kent in Barber's case, 2 Johns Ch. 232. Mr. Stephens says, "To all lunatics, as well as to idiots, the sovereign is guardian, but to a very different purpose: for the law always imagines that these accidental misfortunes may be removed; and therefore only constitutes the crown a trustee for the unfortunate persons, to protect their property, and to account to them for all profits received, if they recover, or, after their decease, to their representatives." 2 Stephen's Com. 8th Ed. 511.

Under our form of government the sovereign state has the same common law duty resting upon it concerning the care and custody of persons and estates of those who are idiots from nativity, or who have lost their intellects, and become *non compos*, or unable to take care of themselves. (See *In re Allen*, 82 Vt. 365, 381, 73 Atl. 1078, 26 L. R. A. [N. S.] 232); and it is manifest from the statutory regulations in this respect that the policy of the State is, as at common law, that the estates of such wards shall be appropriated to their proper maintenance, before they can be supported at the expense of the State. Indeed, as held in the Allen case, the statute concerning the insane poor (P. S. 3718) goes further than this; for in cases falling within the provisions of that section it must be found not only that the insane person is destitute of means to support himself, but also that he is without relatives bound by law to support him, before an order can issue for his confinement at the expense of the State.

By legislative enactment in 1890, it was provided: "When-

ever any insane person, now or hereafter supported at the expense of the State, in any asylum for the insane in this State, had, at the time of commitment to such asylum, or after his or her commitment shall have, or own or possess any estate, real or personal, or any pension or annuity, the same shall be appropriated towards the support of such insane person in such asylum." In effect the statute in this respect has hitherto thus remained. In 1894, and again in 1906, some changes in, or additions to, this statute were made; but they all relate to the remedy, and were within the power of the Legislature to make, having a retrospective as well as prospective operation. *Richardson* v. *Fletcher*, 74 Vt. 417, 52 Atl. 1064; *Johnson* v. *Smith*, 78 Vt. 145, 62 Atl. 9, 2 L. R. A. (N. S.) 1000.

The act of 1906, No. 105, Sec. 4, provides a method by which the auditor of accounts is to ascertain the cost of maintaining an insane person at the Vermont State Hospital for the Insane, and he shall keep an account of the cost to the State for the support of such insane person. And by Sec. 5, the account so kept shall be a charge against the insane person and his estate, and the amount shall be collected by the auditor of accounts whenever there is any property or estate of the person against whom the charge stands, out of which it may be collected; and claims therefor against the estate of a deceased person shall be presented and prosecuted by the auditor of accounts, and shall be allowed by the commissioners upon such estate, and paid by the administrator or executor; and that the statute of limitations shall not apply to such claims. These provisions appear in the Public Statutes, sections 3731 and 3732. The fact that these claims are expressly excluded from the operation of the statute of limitations is quite conclusive that the time when the estate or property of the insane person be acquired is immaterial. See *Montgomery County* v. *Nyce*, 161 Pa. St. 82, 28 Atl. 999.

That the Legislature has the power to make the property and estates of such wards of the State liable for their maintenance there can be no doubt. Legislation of this character is along the lines of the common law, the underlying principles are the same. Indeed, in *Camden County* v. *Ritson*, 68 N. J. Law, 666, 54 Atl. 839, the court said the statute there under consideration charging the estates of insane persons with their mainte-

nance was but declaring of that which was a fact at common law. And in Kentucky where there is a statute essentially like the one before us, it has been held that even though the judgment of the county court committing the lunatic was void, the asylum could recover against him on a *quantum meruit* for his keep, his board and treatment being regarded as necessaries. *Hopper* v. *Eastern Ky. Lunatic Asylum, (Ky.)*, 85 S. W. 1187; *Michaels* v. *Central Ky. Asylum*, 118 Ky. 445, 81 S. W. 247. But whether the substantive right be by the common law or by statute, a particular or new mode of enforcing it may be prescribed by legislative action.

The views here expressed are in harmony with the holdings of the highest courts in other states where statutes of similar import were involved. *Camden County* v. *Ritson*, cited above; *Kaiser* v. *Kansas*, cited above; *In re estate of Yteirburru*, 134 Cal. 567, 66 Pac. 729; *Gressly* v. *Hamilton County*, 136 Iowa, 722, 114 N. W. 191; *Thode* v. *Spofford*, 65 Iowa, 294, 17 N. W. 561; *Eversole* v. *Eastern Ky. Asylum*, 100 S. W. 300; *Hopper* v. *Eastern Ky. Lunatic Asylum*, cited above; *Simons* v. *Van Benthuysen*, 121 Mich. 697; *Newburyport* v. *Creedon*, 146 Mass. 134, 15 N. E. 157; 148 Mass. 158; *Cape Elizabeth* v. *Lombard*, 72 Me. 472.

The defendant relies upon decisions in this State and in Massachusetts and New York, holding that money expended by a town in support of a pauper cannot be recovered of the pauper without a contract, express or implied, of repayment, citing *Bennington* v. *M'Gennes*, N. Chipman, 25, 1 D. Chipman, 44; *Benson* v. *Hitchcock*, 37 Vt. 571; *Albany* v. *McNamara*, 117 N. Y. 168, 22 N. E. 931, 6 L R. A. 212; *Deer-Isle* v. *Eaton*, 12 Mass. 328.

At common law, towns are not liable to support paupers. And under the statute it has been held that no person can be chargeable while he has means to support himself: if he has property, either real or personal, he must first expend that in his own support before he can make any legal or effectual call for relief. *Londonderry* v. *Acton*, 3 Vt. 122. When aid is furnished a pauper in accordance with the statute, it is regarded as a charity extended by the town without expectation of reimbursement, and consequently except by contract no liability

attaches to the person aided. Such was the holding in the cases upon which the defendant relies. Yet this does not militate against the liability of the pauper, and his estate subsequently acquired, when made so by statute. In Massachusetts, at a time later than the decision in the case cited above, it was held that the Legislature has the same right to provide for the reimbursement of the towns out of such property as the pauper may acquire, as it has to exact of the towns the support of their paupers. *Medford* v. *Learned,* 16 Mass. 215.

*Judgment affirmed.*