JUVENILE AND DOMESTIC RELATIONS CT., ESSEX COUNTY.

IN THE MATTER OF THE SUPPORT OF ELIAS BEDFORD IN THE ESSEX COUNTY HOSPITAL FOR THE INSANE AT OVERBROOK.

Decided July 10, 1933.

Before Judge JOSEPH SIEGLER.

For the petitioner, county of Essex, *Arthur T. Vanderbilt*, county counsel.

For the respondent, *Seymour & Seymour* (by *Arthur B. Seymour*).

SIEGLER, J. This is a proceeding on a petition filed by the county of Essex, praying that an order dated May 8th, 1928, committing Elias Bedford as a patient at the Essex County Hospital for the Insane at Overbrook, be amended to read—first, that Elias Bedford had sufficient estate for his support and maintenance at the time of his commitment and, therefore, was non-indigent at the time; second, that the estate of Elias Bedford be charged for the payment of the board and maintenance of Elias Bedford at the *per capita* cost rate from the time of his commitment, on March 19th, 1928, when a temporary order of commitment was made; and, third, that an order be made requiring Clifford F. Bedford and Edward J. Bedford, guardians of Elias Bedford, to pay the county of Essex such amount as shall be ascertained to be due the county of Essex for such board and maintenance.

A brief recital of the facts upon which this application was made will serve to a better understanding of the issues involved. Elias Bedford was admitted to the Essex County Hospital at Overbrook, as an insane patient, on a temporary order of this court, on March 19th, 1928, and confined there until final order of commitment entered by this court on May 8th, 1928. He was committed to the Essex County Hospital as an indigent patient, and has been such patient since March 19th, 1928, and has been supported as an indigent patient, at the charge and expense of the county of Essex, as was provided for in the order of commitment. The order of commitment and the finding made by the court that Elias Bedford was indigent were based upon the testimony of his then wife, Anna Bedford, taken before the Esssx county adjuster on May 8th, 1928. The county of Essex now contends that the testimony of Anna Bedford, the wife, was false and a fraud on the court, and that Elias Bedford, in fact, had financial ability and an estate which could pay for his board and maintenance at the hospital. The respondent, here represented by Clifford F. Bedford and Edward J. Bedford, filed an answer admitting the fraudulent testimony of Anna O'Brien Bedford, the wife, in the following allegation in paragraph 3:

"The commitment of said Elias Bedford to the Essex

County Hospital for the Insane as an indigent patient was procured by the fraudulent testimony of said Anna O'Brien Bedford, and her estate should be charged with the support of said Elias Bedford at the time of his commitment, if such a charge can legally be made."

This admission disposes of the question of fraud upon the court when the commitment was made. It is immaterial, for the purposes of this proceeding, whether the order was obtained through the testimony of respondent's wife or some other material witness. The fact remains that the finding of Elias Bedford as indigent was fraudulently obtained. This leaves the question of the indigency of Elias Bedford as of the time of the order open for adjudication now. Respondent further sets up in his answer the claim that the estate of Anna O'Brien Bedford, the wife of respondent, should be charged with the support of Elias Bedford from the time of his commitment. There has been no authority furnished me, nor have I been able to find any, that will support this contention. There might have been some merit to this claim were it established that Elias Bedford had no estate which could have been made liable for his board and maintenance. This is not such a situation.

The answer further sets up the claim that Elias Bedford is not legally chargeable with the payment of the *per capita* cost rate from the time of his commitment, nor for his board and maintenance, nor are his guardians so liable, and that the *per capita* cost rate is not a reasonable sum for the support of the said Elias Bedford, and the *per capita* method is not the proper method for ascertaining such reasonable sum, and, further, sets up the claim, which is not embraced in the answer but will be considered as part of the answer, that this court has no jurisdiction to determine the amount due for board and maintenance excepting by plenary action at law and a trial by jury. This practically presents the position of both sides in this controversy.

The answer admits paragraphs 1, 2 and 3 of the petition, and these are the facts upon which the first question is involved; that is, whether or not Elias Bedford was indigent or non-indigent. It appears that, in 1918, Bridget Bedford,

the respondent's first wife, died intestate and left a two-family house, the title to which descended to Clifford F. and Edward J. Bedford, sons, subject to the curtesy right of this respondent. On October 23d, 1919, respondent remarried with one Anna O'Brien. For a period of eight years following this marriage, Elias Bedford accumulated money savings, which were deposited in a bank in the joint names of himself and his then wife, amounting to over $5,000. Upon the death of Anna O'Brien Bedford, on October 13th, 1930, the sum of $5,000 or more was claimed by one Mary Kennedy, as beneficiary under the will of Anna O'Brien Bedford. This claim was litigated by the two sons of Elias Bedford in a proceeding brought in the Court of Chancery of New Jersey. This suit did not go to issue, but was adjusted, or compromised, resulting in the payment of $5,000 out of Mrs. Bedford's estate, which was placed in the estate of Elias Bedford, represented by Clifford F. Bedford and Edward J. Bedford as guardians. There is now in the estate of Elias Bedford the sum of $4,000, subject to such liabilities as are or may become outstanding against his estate.

It is clear, therefore, and I find as a fact, that Elias Bedford was non-indigent and was financially able, at the time of his commitment to the Essex County Hospital at Overbrook for the Insane, to pay for his board and maintenance. The order of indigency made by this court was obtained by false testimony, and, therefore, is invalid. I hereby declare it void and of no effect. An order will be entered changing the status of Elias Bedford from indigent to non-indigent.

The next point to be considered is the liability of an insane patient for support. In 32 *Corp. Jur.* 686, § 373:

"Liability for supporting insane persons may be, and often is, imposed by statute upon various public authorities upon certain conditions. This liability being statutory, the particular public authorities can be held liable in no case, and in no other manner, except as prescribed by statute."

Citing, with approval, *Mercer County* v. *Warren County*, 23 *N. J. L.* 415.

32 *Corp. Jur.* 687, § 374: "While there is some *dicta* to the effect that, under the common law, the estate of a lunatic

was liable for his maintenance at public expense, the statutes conferring the right on public authorities to sue, being merely declaratory of the common law and providing a remedy for the collection of an existing debt, it is generally held that at common law, and in the absence of express contract or deception as to the ability to support himself, the public authorities may not recover from the lunatic or his estate the expenses incurred on his account, neither can they recover from those liable to support him; but the right of action may exist only by statute imposing a personal liability for such support." Citing, with approval, *Jones County* v. *Norton*, 91 *Iowa* 680; *Warren County* v. *Harden*, 95 *N. J. L.* 122; 112 *Atl. Rep.* 196; *Oneida County* v. *Bartholomew*, 82 *Hun* 80; *affirmed*, 151 *N. Y.* 655.

Quoting further from the same section:

"It being the policy of the state that the estates of lunatics shall be appropriated to their proper maintenance before they can be supported at public expense, the legislature may, and they often do, permit the public authorities to recover the expenses incurred in support of an indigent insane person from his estate, or from those liable for his support, or from other public authorities liable therefor. * * * The right of recovery being statutory, the authorities must bring themselves within the purview of the statute." Citing, with approval, *State* v. *Ikey*, 84 *Vt.* 363; 79 *Atl. Rep.* 850; *Chapin* v. *Kelly*, 196 *Mass.* 66; *Warren County* v. *Harden*, 95 *N. J. L.* 122; 112 *Atl. Rep.* 196; *Burlington County* v. *White*, 105 *Atl. Rep.* 730; *Camden County* v. *Ritson*, 68 *N. J. L.* 666; 54 *Atl. Rep.* 839.

This being the established rule at common law, we must look to the statute for guidance and direction with respect to the liabilities, if any, owing from the estate of an insane patient committed to a public institution for reimbursement for maintenance and care. Elias Bedford was committed and admitted to the Essex County Hospital at Overbrook by virtue of the provisions of chapter 147, section 430, laws of 1918, which provide as follows:

"430. If the judicial officer shall determine that the patient is insane and has sufficient estate to pay for his full mainte-

nance as fixed by the board of managers or board of chosen freeholders, as the case may be, or if the person or persons legally liable for his support as herein provided, are able to pay for his maintenance, fixed as aforesaid, said judicial officer, after determining the legal settlement of such patient, may, in his discretion, commit such patient to any state or county institution for the care and treatment of the insane in this state. In the final order of commitment he shall direct that the care and maintenance of such patient in the institution designated in said order shall be paid out of the estate of the patient or by the person or persons chargeable by law with his support, or by contract, as the case may be, and such order shall specify the amount per week which shall be paid thereunder, and shall, in the discretion of the judicial officer, contain such direction as may seem proper concerning security to be given for such payment. *Provided, however,* that nothing contained herein shall be construed to prevent such judicial officer from ordering the payment out of the estate of such patient, or by the person or persons legally liable for his support, of any part of the cost and expense of the care and maintenance of any indigent patient in any state or county institution, and such sums shall be collected by the county collector of such county and shall be paid to the state treasurer in the case of state indigent patients, or to the board of chosen freeholders in the case of county indigent patients."

This section, as amended by chapter 332, paragraph 1, pages 751, 752, laws of 1929, among other things, provides:

"In the final order of commitment, he (the judicial officer) shall direct that the care and maintenance of such patient in the institution designated in said order shall be paid out of the estate of the patient or by the person or persons chargeable by law with his support, or by contract, as the case may be, and such order shall specify the *per capita* cost of maintenance as fixed from time to time by such institution, which shall be paid thereunder," &c.

It is the clear policy of the state, under this statute, where a patient has an estate, that the order be for full payment against his estate upon a *per capita* cost basis as fixed from

time to time by such institution. To the extent authorized by this statute, the rule is in derogation of the common law.

An examination of section 441, as amended by chapter 322, laws of 1929, at page 753, shows:

"The minimum rate of payment for the maintenance of any non-indigent patient shall be fixed by the board of managers or the board of chosen freeholders, or a committee thereof, at the *per capita* cost rate of maintenance at said institution, and shall be construed to be a reasonable charge for the care and treatment of any such patient and for necessaries advanced to any such patient."

This statute, in unmistakable language, gives us the method by which the court is governed in fixing the cost of maintenance of the insane. It is not left to guess or speculation, nor is it placed within the discretion of the court. It must be based on evidence from those at the institution who are charged with the responsibility of disbursing the money appropriated for its care and maintenance. The petition in this cause is supported by such evidence. The county of Essex produced, as a witness, Herbert Walker, who gave his testimony and was subjected to cross-examination before this court in this proceeding. Mr. Walker is the chief clerk of the Essex County Hospital at Overbrook, the place of confinement of the respondent. He has charge of compiling and making up what are frequently termed the *per capita* costs, for the maintenance of patients at that institution. He explains how he arrives at the *per capita* costs, and illustrates how the *per capita* cost is established. He fixes the *per capita* cost for this patient over the period of his confinement by showing that, in 1927, it cost the county of Essex $1,336,035.05 to operate the institution; that the average daily number of patients in the wards was two thousand forty-five and five-tenths; he divides this number into the larger amount and then multiplies it by seven, which gives the weekly amount, and arrives at the *per capita* cost per week for the year 1928, $12.89; 1929, $12.63 per week; 1930, $12.04 per week; 1931, $11.68 per week; 1932, $10.39 per week.

The authority of this court to fix an order is governed by

the method provided in the statute, and when, as in this case, the estate of the inmate is sufficient to meet this responsibility, the court has no alternative but to base the order on the minimum rate, which the statute clearly intends to be the *per capita* cost rate of maintenance, "which shall be construed to be a reasonable charge."

The respondent claims that a reasonable cost should be ascertained by a method other than that provided for in the statute, and that the court has the right to fix any amount that may be just and equitable after consideration of the ability of the inmate or his estate. There is no merit in either of these contentions, for the reason that, where an inmate is non-indigent and has an estate sufficient to pay, the provisions of the statute apply, and no other method can be adopted; and for the further reason that, only in a case where the patient or his estate is found unable to pay the *per capita* cost, can the court fix a lesser amount consistent with the ability and the capacity of the estate to pay. If these two methods fail, then those secondarily liable under the statute can be made to pay according to their ability; that is to say, the sons and daughters or others liable for his support.

The next point raised by the respondent is that the court cannot make an order which will oblige the respondent to pay for his support from the time of the commitment, but that this must be from the time of the change of status (from indigent to non-indigent). There is no merit in this contention, because this is fully provided for, in clear and unmistakable language, in section 444, chapter 147, laws of 1918, page 393, as follows:

"444. When any patient shall be committed to any state or county institution as an indigent patient, and it shall subsequently appear that such patient, or some person chargeable with his care and maintenance as provided for in this act, is able to pay all or any part of his care and maintenance, *including arrearages,* it shall be the duty of the attorney-general or the county counsel, as the case may be, as soon as he shall obtain such information, to apply to the judicial officer for the reopening of the matter, and such judicial officer shall have the power at any time, in his discretion, to

reopen the case, take additional testimony and inquire into the facts, and may commit such patient as a non-indigent patient if there shall be sufficient moneys to pay his full maintenance, as fixed by the management of the institution, *and make such further order requiring the estate of such patient or the person or persons so chargeable by law to pay such amount for the care and maintenance of such patient as shall be specified in said order, and shall make such further order as may be necessary."*

To the court is given express power, in this provision, to "make such further order requiring the estate of such patient or the person or persons so chargeable by law to pay such amount for the care and maintenance of such patient as shall be specified in said order, and make such further order as may be necessary." This court, therefore, derives the power from this statute, not only to order arrearages for maintenance of the inmate to be paid, but to make such order requiring the estate of such patient so chargeable by law to pay such amount for the care and maintenance of said patient. This obligation is legally the responsibility of the estate of the inmate, and is to be paid by the guardians. It was so intended when the following statute was enacted: Section 433 of the laws of 1918, page 388, which provides as follows:

"433. In all cases where, on final hearing, it appears that the patient is possessed of real or personal property and no arrangements have been made for the payment of such patient's maintenance, and no application has been made for the appointment of a guardian of the estate of such patient, an application may be made to the Court of Chancery, and such court shall have power to appoint some competent person, resident in this state, guardian of such estate during such commitment, *whose duty it shall be to conserve such estate for the purpose of maintaining such patient in the institution in which he may be lawfully confined, and such guardian is hereby authorized to pay such maintenance under the direction of such court * * *."*

By an earlier statute, it was also declared the policy of the state that the personal estate and income from real estate of an incompetent should not be preserved for inheritance by

others while the costs of maintenance and debts of the incompetent are unpaid. Revision of 1877, page 601; 2 *Comp. Stat., p. 2781.*

The estate under consideration in this case has $4,000 in cash in its possession, which is responsible for any debt or obligation of Elias Bedford and continues to be liable so long as there are sufficient funds in the patient's estate to pay for support and maintenance on the basis provided for in the statutes outlined here. It is the duty of the guardians to use all of the money for that purpose. It is no answer to this claim to say that all of this money would be exhausted if the accumulated arrearages were to be satisfied out of this fund, for the reason that, if the fund in the hands of the guardian is used up, the statute makes provision for the reopening of the case to reduce the payment to such sum as might be able to be paid by the estate of the patient or those secondarily liable—in this case, the patient's children—and makes further provision that, if the patient or those secondarily liable are unable to pay, then the court is obliged, under the law, to change the status of the patient to that of an indigent patient and direct that the costs and expense of his maintenance be placed upon the county. The statute merely declares that which is moral and just and which, without the statute, should dictate itself as a proper thing to be done when society undertakes to care for the mental or physical deficiencies of its inhabitants when they have financial capacity to pay for this care, support and attention. There is nothing new or novel in this responsibility. This is the acceptable standard in all relationships in society.

The last point made by the respondent was that he would be deprived of the constitutional guaranty of a right to trial by jury. There is no merit to this contention. This is not the type or the kind of action considered recognizable under this guaranty. This right depends entirely upon the recognition that was afforded at the common law before the constitution was adopted or upon any legislative sanction expressly provided for in the statute. It is well settled that our constitutions did not enlarge the right to trial by jury which existed at their adoption; they were designed merely to pre-

serve it inviolate in cases where it was previously enjoyed. *McGear* v. *Woodruff,* 33 *N. J. L.* 213; *Howe* v. *Plainfield,* 37 *Id.* 145.

This kind of action did not exist at the time of the adoption of our own state constitution nor at the time of the adoption of the federal constitution. The language of Mr. Justice Depue, in *McGear* v. *Woodruff, supra,* is pertinent here:

" 'The right of trial by jury shall remain inviolate.' * * * It was not intended to introduce trial by jury in cases where it did not exist before, but merely to preserve it inviolate in cases where it existed at the time of the adoption of the constitution."

This was adopted, with approval, in *In re Application for Drainage of Lands, &c.,* 35 *N. J. L.* 507; *Edwards* v. *Elliott,* 36 *Id.* 449; *Howe* v. *Plainfield, supra; Sparks* v. *Stokes,* 40 *Id.* 487; *Shivers* v. *Newton,* 45 *Id.* 469.

The only case which, at first blush, seems to conflict with the foregoing authorities, but which, on examination, will be found not out of accord, is *Greely* v. *Passaic,* 42 *N. J. L.* 429.

In the case of *State Board of Medical Examiners* v. *Buettel,* 102 *N. J. L.* 74; 131 *Atl. Rep.* 89 (at *p.* 91), this court adopts the language of *McGear* v. *Woodruff, supra:* "The fact that the suit is a civil suit does not settle the question of the right to trial by jury. There may be cases where it would be competent for the legislature to prescribe a summary proceeding in a civil suit even where, as at common law and at the time of the adoption of the constitution of 1844, penalties were recoverable by the ordinary action of debt."

"Our business at present is to ascertain how far the right to a trial by jury extended—to what controversies it was applicable. It was a right—the title to which was founded upon usage—and its measure is therefore to be sought in the usage which prevailed at the time when it was asserted. But never in England was there any usage, and, consequently, was there any right in the subject, that every litigated question of fact should be submitted to a jury. In all that large class of cases which are cognizable in courts of equity, there never

was any right of trial by jury, nor did the right extend to many other civil and criminal proceedings. Summary convictions for petty offenses against statutes were always sustained, and they were never suffered to be in conflict with the common law right to a trial by jury. The ancient as well as the modern British statutes at large are full of acts of parliament authorizing such convictions, without referring to those which have been passed against non-attendance upon public worship of the established church, against refusal to take oaths of allegiance, against profaneness, and embezzlement, all of which provided for conviction and punishment of offenders without the intervention of a jury, it may suffice to notice the vagrant acts and the proceedings under them." *Howe* v. *Treasurer of Plainfield, supra; Byers* v. *Commonwealth,* 42 *Pa. St.* 89.

Appropriate language was used on this question in the case of *Minneapolis and St. Louis Railway Co.* v. *Bombolis,* 241 *U. S.* 211 (at *p.* 219), speaking through Chief Justice White:

"It is true that the right to a jury trial which the seventh amendment secures is a substantial one, in that it exacts a substantial compliance with the common law standard as to what constitutes a jury, but this truth has not the slightest tendency to support the contention that the substantial right secured extends to, and is operative in, a field to which it is not applicable and with which it is not concerned. A statutory proceeding before a special tribunal, to determine claims against a city which have no legal obligation, is not a suit at common law within the meaning of the United States constitution, seventh amendment." Citing *Guthrie National Bank* v. *Guthrie,* 173 *U. S.* 528.

It was said in the case of *Ex parte Wall,* 107 *U. S.* 289, 290, that:

*"It is a mistaken idea that due process of law requires a plenary suit and a trial by jury in all cases where property or personal rights are involved.* (Italics mine.) The important right of personal liberty is generally determined by a single judge on a writ of *habeas corpus,* using affidavits or depositions for proofs, where facts are to be established; assessments for damages and benefits occasioned by public

improvements are usually made by commissioners in a summary way; conflicting claims of creditors, amounting to thousands of dollars, are often settled by the courts on affidavits or depositions alone; and the courts of Chancery, bankruptcy and admiralty administer immense fields of jurisdiction without trial by jury. In all cases, that kind of procedure is due process of law which is suitable and proper to the nature of the case, and sanctioned by the established customs and usages of the courts. 'Perhaps no definition,' says Judge Cooley, 'is more often quoted than that given by Mr. Webster in the Dartmouth College case: "By the law of the land is most clearly intended the general law; a law which hears before it condemns; which proceeds upon inquiry and renders judgment only after trial." The meaning is that every citizen shall hold his life, liberty and property and immunities under the protection of the general rules which govern society.' The question of what constitutes due process of law within the meaning of the constitution was much considered by this court in the case of *Davidson* v. *New Orleans, 96 U. S.* 97, and Mr. Justice Miller, speaking for the United States Supreme Court in that case, said: 'It is not permissible to hold that a party has, without due process of law, been deprived of his property, when, as regards the issues affecting it, he has by the laws of the state a fair trial in a court of justice according to the mode of procedure applicable to such a case.' "

There is no authority that was presented by respondent's counsel to support his contention; nor was the court able, after a searching investigation of the authorities on this subject, to find any case, in this state or elsewhere, that justifies the claim made by the respondent. The great weight of authority is that no such right was recognized, and, therefore, the constitutional provision of the federal constitution and of the state constitution does not apply to this kind of action. There was no such right recognizable at the common law, and certainly there is no statute which creates such a right under which the respondent can claim support, and, therefore, there cannot be a denial of trial by jury.

There will be an order entered upon the estate of Elias

Bedford to pay the county of Essex the *per capita* cost of his maintenance for 1928 at the rate of $12.89 per week; for 1929 at the rate of $12.63 per week; for 1930 at the rate of $12.04 per week; for 1931 at the rate of $11.68 per week; for 1932 at the rate of $10.39 per week; the calculations to commence from March 19th, 1928.