## UNITED STATES v. GARTNER et al.
### No. 5368.

District Court of Alaska. Fourth Division. Fairbanks.
Oct. 31, 1945.

Harry O. Arend, U. S. Atty., of Fairbanks, for plaintiff.

John L. McGinn, of Fairbanks, for defendants.

PRATT, District Judge.

## I.

The complaint, filed on August 24, 1945, alleges as follows: That on the 19th day of July, 1927, the defendant George Gartner was legally adjudged insane in the Probate Court at Fairbanks, Alaska, and committed to Morningside Hospital at Portland, Oregon; that on the 1st day of August, 1927, the defendant Mike Erceg was duly appointed guardian of the estate of said George Gartner by order of said Probate Court, he qualifying immediately; that said George Gartner was admitted to said Morningside Hospital on the 10th day of August, 1927, where he has since remained; that the plaintiff has paid the reasonable cost of the care and maintenance of said George Gartner at said Hospital during the said period, to wit, the sum of $9,180.11, no part of which has been paid though demanded of the defendant Erceg, as such guardian.

The complaint does not allege that said George Gartner was a pauper, but inferentially shows he was not in that he had property for which a guardian was appointed on the 1st of August, 1927.

The defendants have interposed a general demurrer to the complaint.

## II.

As our code made the common law of England, except as modified by statute, the law of Alaska during all time concerned in this case, it becomes necessary to ascertain what the common law was with reference to reimbursement of the sovereign for expenses incurred in the care of an insane person.

In State v. Ikey's Estate, 1911, 84 Vt. 363, 79 A. 850, 851, Ann.Cas.1913A, 575, it was stated:

"It is said by Lord Coke that if a man who was of sound memory becomes non compos mentis, * * * the king shall protect him who cannot protect himself, and shall take the profits of his lands, and of all that he had, and therewith maintain him and his family; but the king shall not take any part of the said profits to his own use, and that all this appears by the statutes De Prærogativa Regis, 17 Edw. II, c. 10, which was but a declaration of the common law. * * *

"Pollock and Maitland in their History of English Law (volume 1, p. 464) say this document known as Prærogativa Regis seems to be the oldest that gives any clear information about a wardship of lunatic.

" 'The king is to provide that the lunatic and his family are properly maintained out of the income of his estate * * *.' Bac. Abr. tit. Idiots and Lunatics C. * * *

"Mr. Stephen says: 'To all lunatics, as well as to idiots, the sovereign is guardian, but to a very different purpose; for the law always imagines that these accidental misfortunes may be removed; and therefore only constitutes the crown a trustee for the unfortunate persons, to protect their property, and to account to them for all profits received, if they recover, or, after their decease, to their representatives.' 2 Stephen's Com. (8th Ed.) § 511."

The court said:

"By the common law of England it is the duty of the king to take care of all his subjects who, by reason of their imbecility and want of understanding, are incapable of taking care of themselves. * * *

"Under our form of government the sovereign state has the same common-law duty resting upon it concerning the care and custody of persons and estates of those who are idiots from nativity, or who have lost their intellects, and become non compos, or unable to take care of themselves * * *; and it is manifest from the statutory regulations in this respect that the policy of the state is, as at common law, that the estates of such wards shall be appropriated to their proper maintenance, before they can be supported at the expense of the state."

A holding contrary to that of State v. Ikey's Estate, supra, is found in 44 C.J.S., Insane Persons, § 75, page 177, in the statement, "At common law states and municipalities were not charged with the duty of supporting insane or incompetent persons." It is based entirely upon the case of State Department of Public Welfare v. Shirley, 1943, 243 Wis. 276, 10 N.W.2d 215.

That case lays down the rule above-mentioned, citing only the cases of Patrick v. Town of Baldwin, 1901, 109 Wis. 342, 85 N.W. 274, 53 L.R.A. 613, and Coffeen v. Town of Preble, 1910, 142 Wis. 183, 125 N.W. 954, 27 L.R.A.,N.S., 1079, 20 Ann.Cas. 753, neither of which hold anything in regard to the duty of a state (or sovereign) toward insane persons, but merely that towns did not at common law have the duty of supporting poor persons.

A distinction between poor persons and insane persons is made, not only at common law, but in most modern statutes.

In the case of Richardson County v. Frederick et al., 1888, 24 Neb. 596, 39 N.W. 621, 623, the court said:

"The insane person is not consulted as to whether he shall be deprived of his liberty or not; nor, indeed, are his friends or relatives. As is said in County of Delaware v. McDonald, 46 Iowa 171 · 'The state reaches out its strong arm and makes the insane its wards, regardless of the care which they may receive at home, or the wishes of those upon whom they are dependent for their support. The poor are not deprived of their liberty, and we know of no law which would even permit the county or state authorities to wrest such persons from the care and custody of relatives and friends, and confine them in a poor-house; nor would they be so confined, against their own consent, for no other reason than that they were 'unable to earn a livelihood in consequence of any bodily infirmity.' etc. With the insane it is entirely different. * * * Society is entitled to be protected and relieved against him; * * *."

In McNairy County v. McCoin, 1898, 101 Tenn. 74, 45 S.W. 1070, 41 L.R.A. 862, the court cited with approval Goodale v. Lawrence, 88 N.Y. 513, 42 Am.Rep. 259, and Town of Rumney v. Keyes, 7 N.H. 571, 576, holding that the overseers of the poor, as well as an individual who furnished such supplies, could maintain an action against the husband for supplies furnished to a wife. Then the court held [101 Tenn. 74, 45 S.W. 1071]:

"The duty imposed by the common law upon the guardian to maintain and support his ward is no less obligatory than that imposed upon the husband to support his wife; and if the guardian, with means of the ward at his disposal, breaches his duty, and permits his ward to become a charge upon the county, it should be reimbursed for expenses incurred in supplying necessaries to said ward. It is true, the county asylum established under the laws of this state is a charitable institution. It was designed for the care and maintenance of indigent paupers, and not for the benefit of those who have means sufficient to support themselves. If, therefore, it appears that the county, through

the neglect of the guardian, has been compelled to provide for one who was not a pauper, it would seem but just that the county should be indemnified out of the funds belonging to the ward; and to this effect is the great weight of authority. * * *"

In Dandurand v. Kankakee County, 1902, 196 Ill. 537, 83 N.E. 1011, 1012, Dandurand, an insane person, was cared for by the county which sued to recover the cost thereof. The court said:

"He (Dandurand) was in need of board, care, and medical attention, and was obviously unfit to be at large, and the county furnished him that care. His conservator knew the facts, and did not offer to provide for him elsewhere, or take any steps to have any change made. We are of opinion defendant was impliedly liable for these necessaries so furnished him. * * *"

In re Yturburru's Estate, 1901, 134 Cal. 567, 66 P. 729, the court held:

"An insane person is liable for the reasonable value of things furnished to him necessary for his support. Civ. Code, § 38. This was so at common law, where the necessaries were furnished by an individual; and we have never seen a case, and do not think any can be found, holding that this rule comes in conflict with any provision of the constitution of this or any other state of the Union. We see no reason why the same rule should not apply to a state hospital for the insane which does and furnishes for the insane person only those things required by the law of the state."

The court, in the case of Directors of Insane Asylum of New Mexico v. Boyd et al., 1932, 37 N.M. 36, 17 P.2d 358, 359, quoted the above by the California court and, in holding the guardian of Boyd liable for her care at the asylum, stated:

"The weight of authority seems to be in accord with this opinion," citing many cases.

In re Boles' Estate, 1934, 316 Pa. 179, 173 A. 664, 665, the court said:

"At common law a lunatic was liable in quasi contract for support. * * *"

To the same effect was the decision of the same court In re Walters, 278 Pa. 421, 123 A. 408.

In the case of Palmer et al. v. Hudson River State Hospital, 1900, 10 Kan.App. 98, 61 P. 506, the court said:

"In the first place, it is contended that there must have been an express contract between the hospital and the insane person, or her guardian, to make her estate liable for her necessary maintenance and care. We do not so understand the law. On the contrary, the estate of an insane person is liable for necessaries furnished him upon an implied contract."

In Kaiser v. State, 1909, 80 Kan. 364, 102 P. 454, 457, 24 L.R.A.,N.S., 295, the court said:

"Whether in the absence of a statute the estate of an insane person is chargeable with the expense of his maintenance at a public institution is a question upon which there is some conflict in the authorities. * * * Such liability is denied in these cases: Montgomery County v. Gupton, 139 Mo. 303, 39 S.W. 447, 40 S.W. 1094; Oneida County v. Bartholomew, 82 Hun 80, 31 N.Y.S. 106, affirmed 151 N.Y. 655, 46 N.E. 1150; State v. Colligan, 128 Iowa 536, 104 N.W. 905. These cases have a contrary tendency: McNairy County v. McCoin, 101 Tenn. 74, 45 S.W. 1070, 41 L.R.A. 862; Dandurand v. Kankakee Co., 96 Ill.App. 464; Id., 196 Ill. 537, 63 N.E. 1011; Palmer v. [Hudson River State] Hospital, 10 Kan.App. 98, 61 P. 506."

In State ex rel. Hilton v. Probate Court, etc., 1919, 142 Minn. 283, 171 N.W. 928, 929, the court said:

"Whether, in the absence of a statute, the estate of an insane person is chargeable with his maintenance at a public institution, is a question upon which there is a diversity of judicial opinion. * * * However, we are not greatly concerned with the rule applicable in the absence

of a statute, in view of the history of the legislation of the past 45 years upon the subject under consideration."

In re Idleman's Commitment (Idleman v. State), 1933, 146 Or. 13, 27 P.2d 305, 309, the court said:

"Some courts declare that those who possess estates ought not expect the public to support them free of charge in the state hospitals, and have allowed judgment against the estates of the inmates, even in the absence of statutes."

In Luder's Adm'r v. State, Tex.Civ.App. 1912, 152 S.W. 220, it was held, as set forth in the syllabus:

"The remedy prescribed by Rev.St.1895, art. 116, for the reimbursement by the state of expenses for maintaining patients in insane asylums, is not exclusive, and does not affect the common-law right of the state to recover for money expended in the care of a demented person against his guardian or other person liable for his support, based on implied duty to pay for the benefits received without reference to the lunacy proceedings, and the common-law remedy is unaffected by the fact that the lunatic is dead, and an action may be maintained against his administrator."

Note contrary opinion, Wiseman v. State, Tex.Civ.App. 1936, 94 S.W.2d 265.

In Board of Chosen Freeholders of Camden County v. Ritson, 1903, 58 N.J.L. 666, 54 A. 839, 840, where the New Jersey statute provided that the insane person and his estate should be liable for the expense of his care in the county hospital, the court said:

"This statute in that regard is but declaring of that which was a fact at common law, * * *."

■ Where a municipality or county is by statute vested with a sovereign's duty, it is subject to the same rules and rights (unless the statute provides otherwise) with reference to that duty that the sovereign would be if it had performed the duty. In re Erny's Estate, 1940, 337 Pa. 542, 12 A.2d 333.

## III.

In 32 C.J., page 687, § 374, it states:

"While there is some dicta to the effect that, under the common law, the estate of a lunatic was liable for his maintenance at public expense (87) * * *, it is generally held that at common law and in the absence of express contract or deception as to the ability to support himself, the public authorities may not recover from the lunatic or his estate the expenses incurred on his account, (93) * * *."

· In note 87 appears the case of Board of Chosen Freeholders of Camden County v. Ritson, N.J., supra.

In 44 C.J.S., Insane Persons, § 75, page 177, the word "dicta" has been dropped, and it states:

"There is some authority to the effect that, under the common law, the estate of a lunatic was liable for his maintenance at public expense, * * *."

The cases cited under note 93 and under the same rule in 44 C.J.S., Insane Persons, § 75, page 178, note 17, when analyzed, give very little support to the rule stated in Corpus Juris.

In the case of Board of Commissioners v. Ristine, 1890, 124 Ind. 242, 24 N.E. 990, 8 L.R.A. 461, there was an express contract between the guardian and the county commissioners that they should keep an insane person in the county poorhouse. The court held that under the Indiana statutes they had no authority to make such contract. Nothing is stated as to the common law, and, if there is any inferential reference to it, it would be obiter dictum.

The following cited cases, to wit, Montgomery County v. Gupton, 1897, 139 Mo. 303, 39 S.W. 447, 40 S.W. 1094; Jones County v. Norton, 1894, 91 Iowa 680, 60 N.W. 200; Bremer County v. Curtis, 1880, 54 Iowa 72, 6 N.W. 135; State v. Colligan, 1905, 128 Iowa 536, 104 N.W. 905; Oneida County v. Bartholomew, 1894, 82 Hun 80, 31 N.Y. S. 106, erroneously apply the common law rule relative to

paupers to cases involving insane persons and negative the right of reimbursement to the public authorities.

■■ Neither the sovereign, nor the county, nor a municipality was at common law required to give care to paupers. 48 C.J., page 432. So any such aid would have been a voluntary gift. On the other hand, the rule as to insane persons was that the sovereign was required to give such care and was entitled to reimbursement, as set forth in State v. Ikey's Estate, supra; also 32 C.J. 626, § 162; 44 C.J.S., Insane Persons, § 3.

The case of Brown's Committee v. Western State Hospital, 1909, 110 Va. 321, 66 S.E. 45, seems to have been decided upon agreement of counsel in court. No study of the authorities on the point is indicated.

In Re Bedford, 1933, 168 A. 134, 11 N.J.Misc. 589, the New Jersey statutes clearly covered the whole situation, and the case was decided upon them. Nevertheless, the court cited 32 C.J. § 374, supra, with approval. It was clearly dicta.

In Wiseman v. State, Tex.Civ.App., 1936, 94 S.W.2d 265, Texas had a complete statutory system for the care of the insane, including liability of such persons and their legal representatives for the cost of their care. The court decided the case entirely upon the Texas statutes. Nevertheless, it quoted and cited 32 C.J., § 374, supra, and also 14 R.C.L., page 566, section 18.

Said section 18 of 14 R.C.L. does not support such a holding, but merely states there is a conflict of authority and cites one case for and one case against the rule.

When the cases on the subject are analyzed, it appears that the weight of authority is to the effect that at common law the sovereign was entitled to be reimbursed for expenses incurred in caring for the insane.

■■■

## IV.

Such being the common law, search will be made of the statutes to see if they provide otherwise.

In all of the time mentioned in this case, the statutes of Alaska have provided that insane persons at large should be tried by jury and committed to an asylum for care when found to be really insane (Section 4671, C.L.A., 1933), the asylum to be one with which a contract had been made on behalf of the United States, which was to pay for the cost thereof (section 4676, C.L.A. 1933). No distinction was made between insane paupers and insane people of property, and no provision was made for reimbursing the sovereign for the expense.

It was provided, however, that a guardian could be appointed for the estate of insane persons and that he should apply the income and profits (and under order of court, the principal) to the comfortable and suitable maintenance and support of his ward (section 4528 and 4546, C.L.A., 1933).

By act of congress, approved April 24, 1926, 44 Stat. 322, chapter 177, 48 U.S.C.A. §§ 50, 50a, consisting of two sections, provided that insane persons should deposit their money with the asylum under contract for the care of Alaskan insane and that, if any such property was still so deposited upon their death or elopement and was unclaimed by the insane person or his legal heirs within five years of death or elopement, the money should be covered into the Treasury of the United States. It further provided that, in every instance of death or elopement where money remained in the hands of the asylum, the Secretary of the Interior should make diligent inquiry as to the whereabouts of the insane person or his legal heirs and thereafter turn over the money to the proper party.

At first reading it would seem that congress did not expect the insane person to owe the United States anything, or it would have provided for such money to be credited

upon the debt, if any. However, these same sections appear to the same effect as amended and extended in the act of congress, approved October 14, 1942, 56 Stat. 783, which definitely provides for reimbursement of the United States.

Thus it appears that the failure to provide that moneys received from patients in the asylum should be credited upon any debt owing the United States was not indicative of an intention on the part of the United States to pay all expenses of caring for an inmate without any claim for reimbursement.

By act of congress, approved October 14, 1942, 56 Stat. 782, it was provided in sections 9 and 10, 48 U.S.C.A. §§ 48a, 46 note, as follows:

"Sec. 9. It shall be the duty of a patient, or his legal representative, spouse, parents, adult children, in that sequence, to pay or contribute to the payment of the charges for the care or treatment of such patient in such manner and proportion as the Secretary may find to be within their ability to pay: Provided, That such charges shall in no case exceed the actual cost of such care and treatment. The order of the Secretary relating to the payment of charges by persons other than the patient, or his legal representative shall be prospective in effect and shall relate only to charges to be incurred subsequent to the order: Provided, however, That if any of the above-named persons willfully conceal their ability to pay, such persons shall be ordered to pay, to the extent of their ability, charges accruing during the period of such concealment. The Secretary may cause to be made such investigations as may be necessary to determine such ability to pay, including the requirement of sworn statements of income by such persons.

"Sec. 10. Any Acts, or parts thereof, in conflict with the provisions hereof are hereby repealed."

■ As a statute is to be interpreted as having a prospective effect, unless it clearly appears to have been the intention of the law-making body that it should have a retrospective effect (59 C.J., page 1159), said section will be examined with that rule in view.

■■ The statement that the order of the Secretary as to the payment of charges by persons other than the patient or his legal representative shall be prospective and relate only to charges to be incurred subsequent to the order infers a different rule as to the patient or his legal representative. However, if we interpret the section to mean that the order of the Secretary relating to charges to be paid by the patient or his legal representative shall be prospective and retrospective to the effective date of the act, to wit, October 14, 1942, the inference will be satisfied. As no clear intention on the part of congress to make the section relate to charges arising prior to October 14, 1942, appears, it will be necessary to so interpret said section.

■ Therefore, said act of congress of October 14, 1942, continued the common law duty of the patient or his legal representative to reimburse the government for the expense in caring for an insane person. It limited the duty to the manner and proportion that the Secretary should find to be within their ability to pay, thus requiring such finding for charges incurred after the passage of that act. It, in no way, affected the common law right to reimbursement existing in the government prior to the act and did not provide any procedure relative thereto.

Consequently, as the plaintiff in this case had a vested right to reimbursement prior to October 14, 1942, and was not required to obtain any finding on the part of the Secretary of the Interior as to the ability of the defendants to pay, the complaint in this case states a cause of action, and the demurrer should be overruled.